**NEWPORT TIRE & RUBBER CO., INC., Plaintiff,**
**v.**
**The TIRE & BATTERY CORPORA-TION, Defendant.**

**Civ. No. 80–1166.**

United States District Court,
E. D. New York.

Oct. 6, 1980.

**144**

Kaye, Scholer, Fierman, Hays & Handler, by Sidney Kwestel, Aaron Rubinstein, New York City, for plaintiff.

Smith & Schnacke, by Stanley Freedman, Charles J. Faruki, Dayton, Ohio, Townley & Updike, by James K. Leader, New York City, for defendant.

## DECISION AND ORDER

BRAMWELL, District Judge.

After the twelve-year relationship between the plaintiff Newport Tire & Rubber Co.[1] and the defendant The Tire and Battery Corporation[2] had become severely strained,[3] the defendant's Board of Di-

---

1. *See* Finding of Fact 13.

2. *See* Findings of Fact 25, 26.

3. *See* Findings of Fact 40, 41, 43, 44, 45, 47–59.

4. *See* Findings of Fact 27, 28.

rectors decided to terminate the plaintiff as a distributor of Multi-Mile tires, a private brand tire marketed by the defendant.[4] The plaintiff's reaction to the defendant's decision has taken the form of the instant motion for a preliminary injunction that, if granted, would have the effect of forestalling the proposed termination, at least until the trial of this case. Pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, the Court will assess the plaintiff's motion in the form of Findings of Fact and Conclusions of Law.

## FINDINGS OF FACT

### A. *The Parties*

1. The plaintiff Newport Tire and Rubber Co. Inc. (hereinafter referred to as "Newport") is a New York corporation whose principal place of business is located at 333 Hempstead Avenue, Malverne, New York (88).*

2. The defendant The Tire and Battery Corporation (hereinafter referred to as "TBC") is a Delaware Corporation whose principal place of business is situated in Memphis, Tennessee. Complaint ¶ 1.

### B. *The Tire Industry and the Private Brand Tire*

3. A "private brand tire," the subject of this action, is created from molds that are owned by a marketer; a major manufacturer actually produces the tires (33; *see generally* Def. Ex. 126).**

4. A wholesale distributor then channels the private brand tires to local retail dealers (194).

5. Private brand tires are sold at lower prices than "name brand tires" (195).

6. Little brand loyalty exists among dealers and ultimate customers with respect to private brand tires (201).

7. Price is the most important sales characteristic of the private brand tire (200, 206, 400, 775, 784).

---

* The numbers in parentheses denote reference to the transcript of the Hearing held in this matter on June 23, 24, 25, 26, 30 and July 1, 1980.

** "Def. Ex." denotes reference to the exhibits introduced into evidence by the defendant during the Hearing in this matter.

8. Since low prices derive from high volume, a successful private brand tire marketer must insist on such volume from its distributors (210, 775, 784).

9. Although useful for success in the distribution of private brand tires, positive personal relationships between a distributor and a dealer are of secondary import to the maintenance of a competitive private brand tire price (400, 785).

10. Private brand tire dealers demand same day delivery from their distributors (205, 402, 788); the effect of delinquent delivery is lost sales (405).

11. The tire industry presently is in a chaotic state, brimming with tight competitive margins and with a surplus of available tires (171, 201, 207, 245, 793).

12. The depressed tire market has caused extensive private brand switching among distributors and dealers in recent years (203).

C. *The Plaintiff's Business Structure*

13. The plaintiff is a wholesale distributor of private brand tires, tubes and batteries (29).

14. Newport services between 300 and 350 local tire dealers (352, Pl. Ex. 68, 69).***

15. Hyman Kaufman formed Newport in 1960. Mr. Kaufman is the chairman, president and sole shareholder of Newport (28).

16. Newport employs four salesmen (88) in a sales program coordinated by Ken Kaufman, Hyman Kaufman's son (73, 296).[5]

17. Newport's sales program also includes the implementation of mailings (569, Pl. Ex. 65, 66) to potential customers identified by Dun & Bradstreet printouts (75, Pl. Ex. 25, 28, 29, 67), the placement of advertisements (73, Pl. Ex. 22–24, 27) and the prodigious use of the telephone (83, Pl. Ex. 30).

*** "Pl. Ex." denotes reference to the exhibits introduced into evidence by the plaintiff during the Hearing held in this matter.

5. Any further reference to "Mr. Kaufman" in this Decision and order denotes reference to Hyman Kaufman.

18. One Newport salesman covers Vermont, Connecticut, New Hampshire, Maine and Rhode Island; another covers New York State and Pennsylvania; the third is responsible for New Jersey, Massachusetts and Rhode Island; the territory of the final Newport salesman entails northern New Jersey (99, 567, 597, 622). Hyman Kaufman closely reviews the performance of these salesmen (82, Pl. Ex. 28, 29).

19. Newport utilizes a 37,000 square foot warehouse that is located in West Hempstead, New York (89, 90, 298). Eight warehousemen staff this facility that houses approximately 35,000 tires (605).

20. Newport also employs seven office and mail workers and four truck drivers (88, 96; *see also* Pl. Ex. 32, 36, 37).

21. Newport has a large line of credit with the Bank of North America at ¼ above prime (100, 101, Pl. Ex. 38, 61, 62).

22. A compelling reason for this favorable position with the Bank of North America is Mr. Kaufman's outstanding background and reputation (146).

23. In 1970, Newport received net income from the sale of tires in the amount of $204,000; by 1979, this figure had dropped to $24,000[6] (1015, 1019, Def. Ex. 4, 5, 8–18).

24. As measured by stockholder equity, the net worth of Newport is $750,000 (293).

D. *The Defendant's Business Structure*

25. The defendant is a private tire brand buying cooperative made up of tire distributors and auto chain store owners (765).

26. The members of TBC own the cooperative and run it by selecting its suppliers and lines; eight such members comprise TBC's Board of Directors (769, 774).

6. In 1979, Newport also received $25,120.75 in net income from interest that it received from its customers (1018–19).

27. In 1968, TBC's predecessor, Cordovan Associates, Inc., created the Multi-Mile private brand tire in order to increase both its sales volume and its national domestic tire market penetration (45, 766, 768).

28. Multi-Mile is produced by subsidiaries of Goodyear Tire & Rubber Company (46–48, 196).[7]

29. Presently, there are 70 types of tires in Multi-Mile's deep line (40, 377, 578, Pl. Ex. 3, 58, 59).[8]

30. TBC's distributors are given an exclusive franchise area in which to sell Multi-Mile tires (787).

31. Because it eliminates competition between distributors, the exclusivity offered by TBC is a potent and important selling tool for the distributor (67, 361, 363, 364, 624, 625).

E. *The Relationship Between the Plaintiff and the Defendant*

i) *The Early Years*

32. In 1968, Irving Eisbrouch, the Chairman of Cordovan Associates, the corporate predecessor to TBC, contacted Mr. Kaufman to attempt to interest him in representing the Multi-Mile line in the Northeast Region of the United States (44).

33. After extensive meetings and negotiations (45, 46), Mr. Eisbrouch and Mr. Kaufman entered into two agreements pursuant to which Newport was given the right to distribute Multi-Mile tires exclusively in 11 northeast states, as well as in Washington, D.C., and throughout the world (52, Pl. Ex. 6, 7).

34. The agreements feature the following characteristics:

i) Under the Domestic Agreement, after July 30, 1972, Newport is required to purchase 100,000 Multi-Mile tires, tubes and batteries in each fiscal year to satisfy its contractual obligations (54, Pl. Ex. 6 (Rider ¶ 16), see Pl. Ex. 8);

ii) If Newport fails to make these required purchases, the defendant could request the plaintiff to relinquish parts of its territory;

iii) Cancellation of the agreements could only occur as a result of the mutual consent of the contracting parties, or upon breach of the contract's terms (Pl. Ex. 6 (¶ 20), Pl. Ex. 7 (¶ 14));

iv) In the event of a contract breach by the plaintiff, however, the plaintiff has 60 days to cure said breach (Pl. Ex. 6 (¶ 12), Pl. Ex. 7 (§ 10)).

35. Mr. Eisbrouch was not represented by counsel at any of the negotiations or meetings surrounding the two agreements (256), nor was he represented by counsel at the signing of either agreement (255).

36. In the twelve years it has held the Multi-Mile distributorship in the Northeast, Newport has expended much effort to promote the line through specific Multi-Mile mailings (67, Pl. Ex. 19–21), through telephone solicitation and other advertising (Pl. Ex. 11–18) and through the efforts of Newport's salesmen (632).

37. Nevertheless, the plaintiff does not place the Multi-Mile brand name on its invoices, on its letterhead, on its warehouse or on the outside of its office (335, 338, Def. Ex. 135).

38. As of June 30, 1969, Newport had made $1 million in sales of Multi-Mile products; by June 30, 1972, this figure had risen to $2 million (58).

ii) *Strain in the relationship*

39. By 1977, however, although the plaintiff had always satisfied the contractual minimums for proper performance (117), the defendant began to express dissatisfaction with both the plaintiff's market penetration in its large territory, and with its delivery service to its existing customers (806).

---

7. Approximately 75% of the Multi-Mile tires purchased by TBC are manufactured by the Kelly-Springfield Tire Co. (196).

8. Multi-Mile has six different types of radial tires, two types of belted tires and three types of bias ply tires. The line also contains high performance tires, R.V. tires, light truck tires, heavy truck tires and motorcycle tires (578–80).

40. In late 1977, Marvin Bruce, President of TBC (762), held a meeting with Mr. Kaufman to explore the possibility of increasing Newport's sales volume and of increasing the number of warehouses available to the plaintiff in its territory (806, 807).

41. This meeting was prompted by the defendant's belief that it was impossible for the plaintiff to afford prompt delivery to its vast territory with the single warehouse it maintained in New York (789; see 208, 209).

42. Although Mr. Kaufman promised TBC that a new Newport warehouse would be opened in Boston (Def. Ex. 113, 114), no such warehouse ever was opened (810, 811, 1047).

43. In late 1977, the defendant also began to pressure the plaintiff to sign a "modernized" distributorship agreement that included, inter alia, a provision permitting TBC to terminate the agreement if the distributor engaged in specified acts "detrimental to the interests" of TBC (142, Pl. Ex. 52).

44. Believing that the new agreements destroyed the "protections" inherent in the original agreement (143), Newport rejected it in favor of the original (142, Def. Ex. 115).

45. Newport was the only member of the TBC cooperative that did not sign the new agreement (851, Def. Ex. 116).[9]

46. In 1978, however, Newport "gave back" to TBC its right to exclusively distribute Multi-Mile Tires in Maryland, in Washington, D.C., and in parts of Pennsylvania (144, Def. Ex. 110).

47. In the summer of 1978, Mr. Kaufman noted that freight costs paid by Newport and not reimbursed by TBC had taken an unprecedented rise (660, Pl. Ex. 70). Apparently, this resulted from rail surcharges (130, 432–33).

48. After informing TBC of this situation (131, Pl. Ex. 49), the plaintiff made a claim to the defendant for $54,000 as a result of the unpaid freight allowances (136, 427).

49. After the defendant failed to honor the plaintiff's claim, the plaintiff threatened to take the matter to court (430).

50. Even though the defendant believed the plaintiff's freight claim to be unfounded (Def. Ex. 143), the defendant offered to settle the claim for $11,000 (837).

51. This offer was refused; a claim for the freight allowance is plaintiff's second cause of action in this case. Complaint ¶ 15–20.

52. In late 1978 or early 1979, Cramer-Ziegler, a tire dealer in Newport's territory in Pennsylvania, informed the defendant that it was convinced that the plaintiff could not deliver tires as quickly or as dependably as Wholesale Tire, another TBC tire distributor (452, 456, Def. Ex. 48, 49, 111).

53. In response to Cramer-Ziegler's protestations, Wholesale Tire sold Multi-Mile Tires at 2% below Newport's price to Cramer-Ziegler. These tires were delivered to Cramer-Ziegler within Newport's Pennsylvania territory (124, 441, 456, Def. Ex. 31, 48).

54. Mr. Kaufman considered this act to be an encroachment on Newport's territory (441, 445).

55. In early winter of 1979, in fourteen different transactions, the plaintiff shipped Multi-Mile tires to West Virginia tire dealers located in an exclusive territory of another TBC distributor (123, 126, 462, 658, 689, 693, 696, 702, 704, 705, 843, 844, Def. Ex. 35, 86, 87–100, 147, Pl. Ex. 48, 95).

56. Mr. Kaufman authorized the West Virginia shipments (466, 474, 475, 476, 477, 480, 702, 705, 706, Def. Ex. 52).

57. The plaintiff did not inform the defendant that Multi-Mile tires were shipped to West Virginia by Newport (484); thus, the defendant did not give approval for such shipments (845).

58. The defendant was told that West Virginia shipments were being made to a

---

9. Marvin Bruce, TBC's President, testified on cross-examination that, in his 30 years in the tire industry, he never has seen an agreement like that between Newport and TBC (923).

Pennsylvania tire dealer (489, 690, 692, 695, 696, 700; see Def. Ex. 91).

59. Mr. Kaufman intended the shipment into West Virginia to be a retaliatory act against Wholesale Tire's Multi-Mile shipment into Pennsylvania (556).

### iii) Newport's Performance Under the Agreements

60. In fiscal year 1979, sales of Multi-Mile products accounted for 62% of Newport's gross sales of $7,744,000 and for 66% of Newport's gross profit of $842,000 (42, 43, Pl. Ex. 5; see 38, 728).[10]

61. Between July, 1979 and May, 1980, the plaintiff penetrated portions of its market with Multi-Mile sales in the following manner:

| | | |
|---|---|---|
| Conn. | – | .71% |
| Mass. | – | .625% |
| Maine | – | 0 |
| N.H. | – | 1.35% |
| N.J. | – | .197% |
| N.Y. | – | .41% |
| Pa. | – | .27% |
| R.I. | – | .659% |
| Vt. | – | .079% |

(969, 1002, Def. Ex. 57, 154).

62. In 1979, the defendant penetrated 3% of the replacement tire market in the United States (854, Def. Ex. 34; but see Pl. Ex. 98);[11] in contrast, in 1979, the plaintiff penetrated .44% of the replacement passenger tire market in the Northeast (857, Def. Ex. 39).

63. While it has the largest sales territory of any TBC distributorship in the United States (Def. Ex. 38, 112, 114), the plaintiff has one of the poorest sales penetration records of any TBC distributorship in the United States (808, 862, Def. Ex. 36).

64. The plaintiff has made only one or two sales under its Foreign Agreement (Pl. Ex. 7) with the defendant (790).

10. In 1980's first nine months, Multi-Mile products accounted for 56% of Newport's gross sales of $5,510,880 and for 61% of Newport's gross profit of $631,588 (43, Pl. Ex. 5).

11. Mr. Bruce calculated this figure by dividing the estimated forecast sales in the replacement passenger tire market by the actual unit sales attained by TBC (854–55).

### iv) The Proposed Termination and its Effects

65. Citing the plaintiff's poor market penetration in its area, its poor delivery performance in its territory, the plaintiff's shipment of Multi-Mile tires to a dealer outside its territory, and the plaintiff's allegedly unfounded insistence upon reimbursement for increased freight costs, the defendant's Board of Directors unanimously decided to terminate the plaintiff's right to distribute Multi-Mile tires. This occurred on March 24, 1980 (110, 789, 804, 805, 837, Pl. Ex. 44, Def. Ex. 32).

66. Mr. Kaufman immediately responded to the notice of termination, which Newport received on March 27, 1980, with a telegram which stated that the plaintiff considered the termination invalid due to its alleged lack of a contractual basis. Accordingly, the plaintiff insisted on continued specific performance of the agreements[12] (111, 113, 114, 115, 116, Pl. Ex. 46, Def. Ex. 141).

67. The notice of termination, which came without warning, offered the plaintiff six months of continued association with TBC to ease the plaintiff's transition to alternative forms of tire supply (Pl. Ex. 44, Def. Ex. 32).[13]

68. Louis DiPasqua, Executive Vice President of Sales Marketing for Kelly Springfield Tire Co. (186), expressed his opinion that six months would be ample time for Newport to substitute an alternative private brand tire for Multi-Mile (243).

69. Tires comparable to Multi-Mile are available in today's tire market (196, 229, 230, 235, 241, 794, Def. Ex. 40, 127, 132).

70. Private brands comparable to Multi-Mile include Star, Hallmark, Interstate, Republic, Saxon, Sonic, and Laramie (241–42).

12. At the time that Newport received the notice of termination, its performance met the standards set forth in the Newport-TBC agreements (117).

13. Informally, the defendant has extended this transition period through December 31, 1980.

71. These brands are priced in a manner that is competitive with that of Multi-Mile (242).

72. Mr. DiPasqua expressed his opinion that a distributor with Newport's resources would have no difficulty in substituting an alternative private brand tire for Multi-Mile (236).

73. Allan Gradsky, a certified public accountant called as an expert witness by the defendant (954), expressed his opinion that the loss of Multi-Mile would lead to the potential loss of only twenty existing Newport customers and would produce only a 9½% dollar loss to Newport if the plaintiff replaced Multi-Mile with an alternate tire line (984, Def. Ex. 57, 120).[14]

74. Standing alone, however, the elimination of Multi-Mile from Newport's distributive arsenal would have yielded Newport an operating loss of $302,072.72 in fiscal 1979 (Pl. Ex. 55, 56).

75. Presently, in addition to the Multi-Mile distributorship, the plaintiff serves as exclusive distributor for Remington Tires, a private brand manufactured by Dunlop Tire, see Pl. Ex. 4, in Connecticut, Rhode Island, Massachusetts and in fourteen counties of New York State (162, 305, 646, 647, Def. Ex. 53).

76. The plaintiff also distributes Riken Tires (270), and has dealt with other private brands, such as Interstate Tire, in the past (271, 272, 313, 316, 318, 978, 979, 999, Def. Ex. 1, 2, 3, 6, 7, 102, 148, 149; see Def. Ex. 134).[15]

77. Neither the Remington nor the Riken line are as deep as the Multi-Mile line (41, 578; see Pl. Ex. 57).[16]

78. In 1979, however, 89.4% of the plaintiff's purchases were in 11 of the defendant's 70 Multi-Mile lines (795); similarly, in 1980, 85% of the plaintiff's purchases were in 5 of the defendant's 70 Multi-Mile lines.

## CONCLUSIONS OF LAW

■ To prevail on this motion, the plaintiff must come forward with a showing of (a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief.

*United States v. Siemens Corp.*, 621 F.2d 499 (2d Cir. 1980); *Seaboard World Airlines, Inc. v. Tiger International, Inc.*, 600 F.2d 355 (2d Cir. 1979); *Sonesta International Hotels Corp. v. Wellington Associates*, 483 F.2d 247 (2d Cir. 1973); Mulligan, *Foreword—Preliminary Injunctions in the Second Circuit*, 43 Brooklyn L.Rev. 831 (1977). As the above test makes clear, a demonstration of irreparable harm is a *sine qua non* to the issuance of a preliminary injunction in this circuit. Accordingly, the Court initially will assess whether money damages would be adequate compensation to the plaintiff for the loss of its Multi-Mile distributorship if the plaintiff establishes that the defendant breached its contract with Newport.

■ In this circuit, it is well settled that an act that threatens an ongoing business with destruction causes that business irreparable injury. *John B. Hull, Inc. v. Waterbury Petroleum Products, Inc.*, 588 F.2d 24

---

14. Proceeding from the assumption that anyone who buys over 10% of their tires from lines other than Multi-Mile is willing to accept those lines as brands they could sell (1036–37), Mr. Gradsky reasoned that the loss of the Multi-Mile distributorship probably would lead to the loss of Newport customers whose purchases were 90% or more in the Multi-Mile line (989). Alluding next to Def. Ex. 57, Mr. Gradsky noted that, in the year prior to the institution of this case, only twenty Newport customers purchased 90% or more of their products from the Multi-Mile line. These purchases accounted for 9½% of Newport's business.

15. The plaintiff, however, only sells Multi-Mile batteries and tubes (40).

16. Mr. DiPasqua testified that it is misleading to judge the importance of a tire brand to a distributor by looking solely at the number of lines it possesses. The critical factor in such an analysis is the distributor's utilization of a brand's line depth (407). Therefore, if a distributor does not purchase motorcycle tires (see 543, 644), it is of no moment that the line it deals in contains such tires.

(2d Cir. 1978); *Semmes Motor, Inc. v. Ford Motor Co.*, 429 F.2d 1197 (2d Cir. 1970); *Janmort Leasing, Inc. v. Econo-Car International Inc.*, 475 F.Supp. 1282 (E.D.N.Y. 1979). The Second Circuit, however, has intimated that a moving party possesses an adequate remedy at law if the act at issue threatens only a *disruption* in an ongoing business, and not its destruction. *Jack Kahn Music Co., Inc. v. Baldwin Piano & Organ Co.*, 604 F.2d 755 (2d Cir. 1979); *Jackson Dairy Inc. v. H. P. Hood & Sons Inc.*, 596 F.2d 70 (2d Cir. 1979). Thus, the essential inquiry for this Court on the irreparable harm issue posed by this motion requires this court to ascertain whether or not the defendant's proposed termination of the plaintiff's Multi-Mile distributorship is likely to cause the plaintiff's business to fold.

In its attempt to demonstrate that the proposed termination of its Multi-Mile distributorship is likely to precipitate its demise, the plaintiff initially directs this Court's attention to the fact that Multi-Mile products account for a significant percentage of Newport's gross sales and gross profits (F. 60).* Similarly, the plaintiff deems it noteworthy that the sheer elimination of Multi-Mile revenue figures from Newport for fiscal 1979 would have yielded Newport an operating loss of over $300,000 in that year (F. 74).

To the plaintiff, this severe loss of business will result in a serious impairment to its relations with its customers, its other suppliers, its creditors and its bank. These impairments, the plaintiff argues, eventually will be reflected in a deterioration of Newport's reputation and goodwill, effects that the case law in this circuit has held to constitute irreparable harm. *Jacobson & Co., Inc. v. Armstrong Cork Company*, 548 F.2d 438 (2d Cir. 1977); *Interphoto Corp. v. Minolta Corp.*, 417 F.2d 621 (2d Cir. 1969).

Armed with an array of computations and opinions gleaned from its expert witnesses, the defendant counters the plaintiff's contentions by arguing that damages evolving from its alleged breach of the Newport-TBC contract will be minimal if the plaintiff procures distribution rights to an alternate tire brand. Thus, the defendant contends that the termination of the plaintiff's Multi-Mile distributorship merely will cause a "disruption" in the plaintiff's business. In any event, the defendant maintains that damages emanating from such a disruption can be calculated.

The plaintiff vigorously responds to the defendant's position by arguing that substitution to an alternate brand of tire would be totally unfeasible in this case. In support of this contention, the plaintiff asserts that no private brand is as deep or as attractive as Multi-Mile, and that the loss of such a line will lead to the loss of numerous Newport customers. In addition, the plaintiff maintains that, since no alternate tire brand marketer would afford it the vast exclusive territory it presently possesses with TBC, the concept of substitution is impracticable in this situation.

Careful consideration of the evidence educed at the hearing in this matter, however, has convinced this Court that to view the impact of the loss of Multi-Mile products to Newport as the plaintiff has presented it is to look at the issue blindly. This is so primarily because of the ephemeral nature of the private brand tire industry in which the plaintiff is engaged (*see* F. 3, 4). Due to the fact that the industry's main sales features are price and volume (F. 5, 7, 8, 9), and not brand loyalty (F. 6), extensive private brand switching exists in the industry (F. 12).[17] Thus, as the defendant has contended, the loss of the distributorship of one private brand is not devastating to a distributor if a comparable brand can be obtained as a substitute.[18]

---

* "F" denotes reference to this Court's Findings of Fact.

**17.** This has been especially true in recent years, during which the tire industry has suffered hard times (F. 11).

**18.** As the defendant aptly points out in its reply brief, the availability of substitute products in the private tire brand industry negates the impact on this matter of the "distributorship cases" cited by the plaintiff in support of its position. This is so because the cases advanced by the plaintiff all involved well known

To this Court, the record makes it apparent that tires comparable to Multi-Mile do exist and that, therefore, substitutes for Multi-Mile products are available in today's tire market (F. 69, 70, 71). Since the plaintiff presently deals in private brands other than Multi-Mile (F. 75), and also has exhibited an ability to shift some of its Multi-Mile business to other private brands in the past (F. 76), the Court concludes that a transfer to an alternate tire brand by Newport would be feasible (F. 72), and that such a transfer would generate sufficient revenue to enable the plaintiff's business to continue after it no longer distributes Multi-Mile tires, tubes and batteries.

Moreover, while it is true that Multi-Mile is one of the deepest and most competitive tire lines (F. 29, 77), the plaintiff has failed to exploit these unique characteristics so as to render their loss irreparable. In 1980, for example, 85% of the plaintiff's purchases were in only five of Multi-Mile's 70 lines (F. 78). And, in its twelve year relationship with TBC, the plaintiff cultivated only twenty customers—of the over 300 that it services (F. 14)—who purchased 90% or more of their products from the Multi-Mile line in the year preceding the hearing in this matter (F. 73).

In addition, despite specific Multi-Mile advertising (F. 36; *but see* F. 37), the plaintiff has made poor penetration into all of the states in its exclusive territory (F. 61, 64), achieving only ⅙ of the territory penetration that other TBC distributors do nationally (F. 62). Also, in spite of the fact that the plaintiff has the largest sales area of any TBC distributor in the United States, it has one of the poorest sales records in the TBC cooperative (F. 63).[19]

The plaintiff's insubstantial performance in its TBC territory appears to this Court to be an outgrowth of the disproportionality between Newport's resources and its large Multi-Mile sales area. While Newport's exclusive territory encompasses ten northeast states and the world (F. 33, 46), the plaintiff employs only four salesmen (F. 16, 18), and maintains only one New York based warehouse (F. 19). Taking this into account, the Court is of the opinion that the competitive advantage that a large exclusive area offers a distributor of the plaintiff's magnitude is of minimal significance.

On the contrary, however, the hearing in this case led this Court to believe that, if a distributor of Newport's size concentrated its resources and sales efforts (*see* F. 17, 20) in an area of reasonable proximity to its warehouse, it could, with the selling aid of an "exclusive" (F. 31), reach numerous customers previously untapped and service them with the prompt delivery required in the private tire industry (F. 10). Thus, while possibly forcing the plaintiff to alter the scope of its operations, the substitution of other private brands for Multi-Mile would, in this Court's view, provide Newport with a feasible alternative to the Multi-Mile distributorship that would not threaten it with its destruction.

The availability of such substitution to an alternative tire brand also minimizes the deleterious effect the loss of Multi-Mile would have on Newport's relations with its bank, with its other suppliers and with those who owe it money. Turning first to the plaintiff's claims regarding the impact of the proposed termination on its relations with its bank, the Court must note that the testimony of Hyman Kaufman, the President and sole shareholder of Newport (F. 15), provides the sole substantiation for the claim that the loss of the Multi-Mile distributorship would cause the Bank of North America to dramatically curtail the plaintiff's existing line of credit (F. 12). In the absence of other tangible proof, however,

brands, for which substitution would be unfeasible. These cases include *Guinness-Harp Corp. v. Jos Schlitz Brewing Co.*, 613 F.2d 468 (2d Cir. 1980) (Schlitz beer); *Semmes Motors, Inc. v. Ford Motor Co.*, 429 F.2d 1197 (2d Cir. 1970) (Ford automobiles); *Two Wheel Corp. d/b/a Honda of Mineola v. American Honda*, 79 Civ. 3064 (E.D.N.Y., Mar. 19, 1980), *aff'd without opinion* 80–7278 (2d Cir. May 29, 1980) (Honda motorcycles).

**19.** The plaintiff always has satisfied the minimum purchase requirements set forth in the controlling agreements (F. 23, 39).

the Court cannot accept this contention in light of the fact that the plaintiff's excellent credit line with its bank evolves primarily from the impeccable relationship between Newport and the Bank of North America. This relationship has been nurtured for over thirty years. And as the record makes apparent (F. 22), this relationship is more a function of Mr. Kaufman's outstanding business acumen than a reaction to his corporation's distributorship of Multi-Mile or of any other line of tire products.

With respect to the feared impact of the loss of Multi-Mile on Newport's collection of accounts receivables, the Court is of the opinion that a six-month period of continued Multi-Mile supply before termination, a transition period similar to that proposed by TBC (F. 67, 68), would provide the plaintiff with enough time to police its accounts, while either phasing them out as customers (due to their professed preference for Multi-Mile), or phasing them in to newly offered brands. Similarly, the Court cannot accept the plaintiff's contention that the loss of Multi-Mile would have a negative influence on its relations with Dunlop Tire, the manufacturer of Remington Tires, a private brand tire also distributed by Newport (F. 75). This derives from the Court's belief that the void created at Newport by the elimination of Multi-Mile would occasion a demand by the plaintiff that any private tire brand marketer would yearn to fill. Thus, rather than desert Newport after it loses Multi-Mile, the Court deems it more likely than not that Dunlop, in its desire to garner more prospective sales, would cooperate with Newport and assist its transition from Multi-Mile.

Finally, the Court will address the plaintiff's argument that the loss of its Multi-Mile distributorship will lead to the destruction of its reputation and goodwill. To this Court, the record and the nature of the private brand tire industry also belie this contention. They make it apparent that the six-month transition period offered by the defendant (F. 67, 68) and by this Court,[20] and the availability of private brand tires comparable to Multi-Mile (F. 69, 70, 71) would enable the plaintiff to service most of its existing customers and its newly acquired customers with the primary item for which they look to it—a *competitively priced private brand tire.* Since such service provides the core of the plaintiff's reputation, *see* F. 5, 6, 7, 8, 9, 10, the availability of an alternate source upon which to predicate that reputation negates the conclusion that the loss of Multi-Mile will cause a serious erosion in Newport's reputation.

■ Accordingly, this Court concludes that the defendant's termination of the plaintiff's Multi-Mile distributorship would not threaten Newport with its destruction. This is not to say, of course, that the termination would not disrupt the plaintiff's business. This appears certain to ensue. Nevertheless, the testimony of the defendant's expert witness, Allan Gradsky, convinced this Court that, if the plaintiff eventually demonstrates that the Multi-Mile termination constitutes a breach of contract, any damages caused Newport by the Multi-Mile termination will be calculable[21] by either the lost profits method[22] or by the valuation of the business method.[23] These damages will provide the plaintiff with an adequate remedy at law for the defendant's alleged breach of contract.

20. *See* the ORDERS that follow the instant decision.

21. Since the plaintiff's complaint presently does not state a request for damages, the plaintiff will have to amend its complaint to pursue a damage remedy. In accordance with Rule 15 of the Federal Rules of Civil Procedure, this Court will grant the plaintiff leave to so amend.

22. The lost profits method in this case would entail a comparison of the profits Newport made before termination of the Multi-Mile line with the profits Newport made after termination of the Multi-Mile line (1007–09, 1012, 1026).

23. The valuation method asks the trier of fact to subtract the value of the business after termination, *i. e.,* the fair market value of the business calculated by a price-earnings ratio, from the value of the business before termination (1021–24).

Therefore, it is this Court's opinion that the plaintiff has failed to establish that the defendant's alleged breach of contract will cause it irreparable harm. Under the law of this circuit, this failure renders unnecessary any present foray by this Court into the merits of this matter. Thus, the Court will express no opinion in this decision concerning the plethora of additional issues raised by the parties in connection with this motion.

For the foregoing reasons, it is hereby

ORDERED that the plaintiff's motion for a preliminary injunction is DENIED; and it is further

ORDERED that, in conformity with this decision, the defendant is to continue to supply the plaintiff with Multi-Mile products for the six-month period commencing with the date of this Decision and Order.