### INGREDIENT TECHNOLOGY CORPORATION, Plaintiff,

v.

### David W. NAY, Florence M. Nay, Daniel S. Nay, and Food Processing Ingredients, Inc., Defendants.

### No. 81 C 3169.

United States District Court, E. D. New York.

Feb. 8, 1982.

Davis & Cox, New York City by Walter H. Beebe, Joseph E. Gasperetti, New York City, for plaintiff.

William M. Goodstein, New York City, for Defendants; Randolph Wiseman, Bricker & Eckler, Columbus, Ohio, of counsel.

## MEMORANDUM AND ORDER

NEAHER, District Judge.

In this suit for injunctive and monetary relief, originally brought in State court, plaintiff ("ITC") charged David Nay with breach of a covenant not to compete, Florence Nay and Daniel Nay, his wife and son, with tortiously inducing the breach, and all defendants with unfair competition. Defendants removed the action here before answer on the basis of the parties' diverse citizenship and amount in controversy. Defendants are all citizens of Ohio and plaintiff is a Delaware corporation with its principal place of business in a State other than Ohio.

Plaintiff has now moved for a preliminary injunction and defendants have cross-moved to transfer venue to the United States District Court for the Southern District of Ohio, 28 U.S.C. § 1404(a). Based on the depositions of defendants and non-parties in Ohio and affidavits from others in support of plaintiff's motion and in opposition to the motion to transfer, the Court concludes that the motion to transfer should be denied, and that a preliminary injunction should issue without further delay for a hearing. In addition, plaintiff's motion to strike defendants' jury demand as untimely should be granted.

The depositions and affidavits submitted establish that for over 40 years prior to 1979, David Nay was a salesman of spices and seasonings (sometimes referred to collectively as "ingredients") and other products to customers in the food processing industry. His sales territory throughout that time period covered principally the State of Ohio, although some of his accounts were located as well in the neighboring States of Kentucky, West Virginia, Indiana, Pennsylvania, and even as far away as Georgia and New York.

After twenty years of calling on essentially the same customers in the same territory for other spice and seasoning companies, Nay and two others started their own

company in 1962, called Seasoning Mills, Inc., and Nay continued to call on the same customers in the same area. His sales efforts often led to close, sometimes personal relationships with his customers, and Seasoning Mills consequently enjoyed a strong customer base for its products. By 1979, however, the company was apparently hardpressed by want of capital, and Nay himself was nearing a retirement age of 65.

After negotiations between the principals in Ohio, Michigan and New York, Nay and his co-owners executed in New York an asset purchase agreement transferring Seasoning Mills' entire business to plaintiff. The agreement covered "properties and assets of every kind and character, real, personal or mixed, tangible or intangible," and expressly included "customer and supplier lists and records of Seller." Purchase Agreement, ¶ 1.2(iii), Exh. 1 to Order to Show Cause. On deposition, Nay acknowledged that Seasoning Mills' customer base was among the assets transferred.

The agreement also provided that after the closing, the three shareholders would not, within five years of the July 30, 1979 closing date,

> "directly or indirectly engage in, or have any interest in any person, firm, corporation, or business (whether as an employee, officer, director, agent, security holder, creditor, consultant or otherwise) that engages in, any activity in any geographic area where [Seasoning Mills] now engages in such activity, which activity is the same as, similar to, or competitive with any activity now engaged in by [Seasoning Mills] in any such geographic area so long as ITC or any subsidiary or affiliate thereof (or any successor thereto) shall engage in that activity in such geographic area." Id., ¶ 3.3(a)(iii).

The three further agreed

> "not to divulge, communicate, use to the detriment of ITC or any subsidiary or affiliate thereof or for the benefit of any other person or persons, or misuse in any way, any confidential information or trade secrets of Seller, including personnel information, secret processes, know-

how, customer lists, recipes, formulas, or other technical data." Id.

The parties also agreed that the Agreement "shall be construed in accordance with, and governed by, the laws of the State of New York." Id., ¶ 8.6.

The agreement transferring the Seasoning Mills business to ITC did not end Nay's work as a spice and seasoning salesman to his former long-time customers. Although no signed copy of an agreement has been located, ITC apparently agreed to designate defendant Food Processing Ingredients, Inc. ("FPI") as its sales representative in the area Nay formerly covered for Seasoning Mills. David Nay's wife Florence caused FPI to be incorporated, and she became its president, while her husband became its employee and salesman at a weekly salary of $87.00, an amount set to keep him eligible for Social Security retirement benefits. Thus, Nay solicited sales for ITC's spices and seasonings as an employee of FPI, and ITC filled the orders he secured.

FPI's place of business was the office which occupied the first floor of the Nays' home in Worthington, Ohio, outside Columbus. The company's phone number, 888–4044, was the same one Nay had used when selling for Seasoning Mills, and Florence sought and received ITC's permission to change the name registered to the number from Seasoning Mills to FPI.

In June 1980 Florence and her stepson Daniel Nay incorporated Food Processing Supplies, Inc. ("FPS") to conduct a business of selling work supplies to the food processing industry, e.g., aprons, gloves, knives and boots. While the business involved lines of goods distinct from spices and seasonings, the food companies to which David Nay had sold for over 40 years were natural targets in the supply business's broader range of potential customers.

FPS was founded as a business for Daniel to take up when he left the last in a series of jobs he had held on the east coast and in Ohio over the previous 18 years, in which he had managed sales and sold for various copier, cosmetic and food companies. Discussions about the new business during

Daniel's visits home on birthdays and holidays were principally between him and Florence. No one seriously disputes, however, that David Nay was consulted about the soundness of the plan and whether there was a demand such a business could satisfy.

In November 1980 Daniel Nay left his job in New Jersey to start up business with FPS, whose office was set up at the parental house where FPI already was located, but with a separate phone number, 888–7076. Daniel's wife and Florence handled incoming shipments and prepared the purchase and shipping orders and other paperwork, while Daniel began the task of securing accounts for a new business.

To give Daniel a boost, David Nay told various people he knew that Daniel was starting a supply business, in the hope that they would give Daniel some business. Since the customers for their respective products often overlapped, the two on occasion would make joint sales visits, the son selling supplies for FPS, the father selling ingredients for ITC as an employee for FPI.

These arrangements began to deteriorate in the first months of 1981. For reasons not entirely clear on the present record, but which appear linked in David Nay's mind with ITC's president not living up to the spirit, if not the letter of their agreement, Nay began to tell his long-time customers, to whom he had been selling ITC spices and seasonings for about six months, that he was finally getting out of the business of selling "ingredients." At the same time he explained that his son Daniel was starting a spice and seasoning company.

The obvious implication of such remarks to Nay's long-time customers was that they should order spices and seasonings through the son. For example, Thomas Nyhan, president of the East Dayton Meat & Sausage Co., Inc., stated that in a meeting in January or February 1981, with both David and Daniel Nay present, the father

"explained that he was going out of the business of selling ingredients. He then introduced his son. His son then explained that he was beginning an ingredi-

ents sales business. The son solicited orders from us. I knew that the son had no previous experience in this field and that the father was very knowledgeable. I would not have dealt with the son but for the fact that he was introduced to me by his father, an experienced ingredients salesman, whom I felt would help the son in this business. The clear implication of the joint visit was that David Nay wanted us to place ingredient orders with his son." Affidavit of Thomas C. Nyhan, ¶ 4, sworn to November 2, 1981.

This occurred while Nay was still working for FPS, selling ITC products.

The new seasonings business Daniel was starting up, again with Florence's help, was called "Seasonings Etcetera," a partnership. It obtained its ingredient supplies from an ITC competitor, Saratoga Specialties, Inc. Although relations between Nay and ITC worsened in March, April and May, Florence and Daniel testified that they did not plan Seasonings Etcetera until early June 1981. Its first orders came in the latter part of the month. On June 30, 1981, ITC, FPI (acting through Florence) and David Nay signed a settlement agreement in which each side released the other from all claims. Paragraph 5 of this agreement amended the 1979 asset transfer agreement by shortening the five-year non-competition clause to a time period expiring July 20, 1982.

After the June 30 agreement was executed, Nay and Daniel continued to call on the customers Nay formerly solicited for ITC and Seasoning Mills. Because the agreement's non-competition clause barred Nay for at least another year from selling spices and seasonings, he arranged with his wife and son to sell supplies for FPS. Daniel, meanwhile, shifted his sales efforts from supplies to seasonings, for Seasonings Etcetera.

On deposition, Nay acknowledged that just as he had boosted his son's entry into the supply business with long-standing customers, he also did so for the son's entry into selling spice and seasonings. This is corroborated by the recollections contained

in the deposition and affidavit of Anthony Terboni, operations manager of Di Pietro Pizza Supply, and of James Boyd of Ohio Packing Company. And Robert Sines of Honey Creek Provisions recalled that after he learned Nay was no longer selling spices for ITC, but supplies for FPS, he asked Nay if he could continue to furnish spices and seasonings, and Nay told him that his son Daniel was now selling ingredients.

Almost immediately after the June 30 agreement, Florence arranged with the telephone company to have the number FPI used when it sold for ITC (888–4044) transferred to Seasonings Etcetera. She did not seek ITC's permission for the switch. On a few occasions customers called that number expecting to order an ITC product. Michael Ebert, plant manager of Meuser's Winchester Farms, recalled in his affidavit that he had phoned Nay in mid-June 1981 to order an ITC bratwurst seasoning Meuser's used, on an expedited basis, and that Nay did not tell him then that he was no longer in the seasonings business and had stopped selling for ITC. It was only when Ebert called again about delivery dates several days later that Nay told him ITC would not be filling the order, but rather "David S. Nay's new company, Seasonings Etcetera," which he was starting. Ebert told Nay that Meuser's would not take a substitute seasoning and cancelled the order.

Jack Flickinger, President of Willy's, Inc., another ITC customer, had a similar experience. On July 23, 1981, he called the Nays at the old FPI number and ordered 600 pounds of seasoning salt from Florence Nay. Only when Flickinger called ITC's Detroit plant did he learn that Nay no longer sold for ITC. He immediately notified his personnel not to accept delivery of the Nay goods.

Other customers who purchased from ITC when Nay was selling for the company have indicated that they have or will switch accounts. Undoubtedly some of these may have heard of Seasonings Etcetera without any word from Nay, and may have been persuaded to switch by the lower prices Seasonings Etcetera promised for its version of ITC's seasonings. (Seasonings Etcetera undertook to match ITC's seasonings by submitting samples obtained from potential customers to its supplier and ITC's competitor, Saratoga Supplies.)

*Discussion*

■ At the conference held on the joint return date of plaintiff's show cause order seeking a preliminary injunction, and defendants' motion to transfer, the Court indicated that decision on the latter motion would precede determination of plaintiff's request for relief. Review of defendants' papers show that the single factor which most strongly favors the exercise of discretion to transfer this case to an Ohio district court is the circumstance that the alleged wrongful acts chiefly occurred in Ohio, and the witnesses to them are therefore so near the Ohio courthouse that their live testimony would be more readily available than in this district, either by compulsory process or voluntarily. While this remains true, and although defendants insist that live testimony should be presented, the force of their arguments is greatly diminished by plaintiff's prompt and persistent efforts to secure depositions and affidavits. As already indicated, these amply support preliminary findings that David Nay has breached his covenant not to compete, that together with his wife and son he has competed unfairly against ITC, and that all three should accordingly be preliminarily enjoined from further violations. No serious credibility or other fact issue has been raised respecting the matters set forth in the depositions or affidavits, and in these circumstances, further testimony would be unnecessary prior to a hearing on the merits.

Turning now to the substance of plaintiff's motion, the activities of the individual defendants clearly warrant the award of preliminary relief under Second Circuit standards. These require the moving party to show (1) irreparable harm, and (2) either (a) a substantial likelihood of success on the merits, or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation, and a balance of hardships tipping decidedly in the moving par-

ty's favor. See, *e.g., Jackson Dairy, Inc. v. H. P. Hood & Sons,* 596 F.2d 70, 72 (2d Cir. 1979). Plaintiff relies chiefly on the existence of irreparable harm and a likelihood of success on the merits.

▮ We think that the facts outlined above amply support a determination that ITC is likely to succeed at trial in proving that David Nay breached his covenants not to compete or divulge customer lists, and that he, his wife and his son have competed unfairly against ITC. This clearly appears from David Nay's strongly implied, if rarely explicit, encouragement to his former ITC and Seasoning Mills customers to patronize Daniel Nay's new spices and seasonings business and, through the use of the former Seasoning Mills and FPI phone number in the new, competing sales business.[1]

David and Florence Nay file joint tax returns and it is therefore fair to infer that any profits Seasonings Etcetera yields to its half-owner, Florence, also benefits her husband. Under the 1979 asset transfer agreement Nay promised he would not "directly or indirectly engage in or have any interest in" any person or business entity that competed with ITC in Seasoning Mills' former sales areas. While Nay may have formally remained apart from the business of Seasonings Etcetera, in practice this distinction has not always been maintained. For example, it was David Nay who smoothed things over with Di Pietro Pizza Supply when basil sold by Seasonings Etcetera proved defective, long after the business had started up.

By taking his son to former ITC and Seasoning Mills customers, Nay also breached the agreement's prohibition against disclosing or "us[ing] to the detriment of [ITC] ... any ... customer lists." While it may be that Daniel and Florence could have

come upon many of David's former customers on their own, the evidence at present sufficiently demonstrates that often they did not.

In taking advantage of David Nay's breach of his covenants, Florence and Daniel began to compete unfairly with ITC. Their dereliction is demonstrated as well by their appropriation of the telephone number from FPI when it ceased doing business, well aware that the company was known in the trade to be a seller of ITC goods. Although they were themselves purveyors of Saratoga Supplies' competing products, they were thus able to secure trade from ITC customers who called in orders, expecting that the Nays still dealt in ITC spices and seasonings. This unfair method of securing trade was compounded by the Nays' failure immediately to inform every caller that the Nays no longer were dealing in ITC's products.

Defendants, however, dispute that any of this constitutes irreparable harm to ITC entitling it to a preliminary injunction. Drawing on cases which for the most part involve injunctions against termination of distributorship agreements, *e.g., Jack Kahn Music Co., Inc. v. Baldwin Piano & Organ Co.,* 604 F.2d 755 (2d Cir. 1979), defendants argue that in this Circuit a plaintiff must establish as proof of its irreparable injury that denial of the injunction "is likely to cause [its] business to fold." *Newport Tire & Rubber Co. v. Tire & Battery Co.,* 504 F.Supp. 143, 150 (E.D.N.Y.1980).

But this case is far different from those defendants rely on, where the only injury was economic and clearly compensable in damages. This suit involves obligations which arise from the sale of a business, including a customer base which all parties recognized formed a major part of the

---

1. Plaintiff has also complained that defendants have misappropriated ITC proprietary recipes, and have used a confusingly similar label in distributing their competing goods. The only unfair competition regarding defendants' misuse of ITC recipes shown on the present record is that some of them may have been obtained from customers that Seasonings Etcetera was unfairly enabled to contact through the aid of

David Nay. The labels do not appear at all similar except in the choice of the first name "Seasonings," and in this regard, there has been no showing that defendants' continued use of this suggestive phrasing in their name, "Seasonings Etcetera," is likely to cause confusion in the food ingredient business with the name "Seasoning Mills."

goodwill and, consequently, of the consideration exchanged for the purchase price.

In New York, the State whose law applies by choice of the parties and because this is a diversity case, the courts have long enforced by injunction agreements not to compete where they are incidental to the sale of a business, and reasonable in duration and geographic scope. See, *e.g., Purchasing Associates, Inc. v. Weitz*, 13 N.Y.2d 267, 271–72, 246 N.Y.S.2d 600, 603, 196 N.E.2d 245, 248 (1963). And, more recently, the New York Court of Appeals has ruled that even apart from an express contractual provision barring competition by the seller of a business, the seller was still prohibited indefinitely, as a matter of law, from soliciting the patronage of his former customers, if the seller chose to enter a competing business, although the customers, of course, remained free to choose the former owner. *Mohawk Maintenance Co., Inc. v. Kessler*, 52 N.Y.2d 276, 437 N.Y.S.2d 646, 419 N.E.2d 646 (1981). The Court based its decision on what it perceived was a critical distinction between a contractual duty undertaken by a seller not to compete, and the seller's obligation to refrain from impairing the value of the assets he had sold, including the goodwill by which the seller had succeeded in securing the loyalty of his customers to the business sold.

In both situations—the contractual covenant not to compete, and the non-contractual duty to refrain from diverting former customers' loyalty—it is evident that irreparable harm to an acquired business flows from the seller's attempt to wean his former customers' attentions away from the business he sold, whether to his own business, or, as in the present case, a business which in form belongs to relatives. As in the *Mohawk Maintenance* case, the "essence of the transaction" between ITC and Seasoning Mills was "in effect, an attempt to transfer the loyalties of the business' customers from the seller, who cultivated and created them, to the new proprietor." *Id.,* 52 N.Y.2d at 285, 437 N.Y.S.2d at 651, 419 N.E.2d at 651.

Clearly, what the purchaser has lost if the seller may solicit his former customers, is the opportunity to cement the loyalties of his new customers to himself. It may be that the customers would choose to take their business elsewhere after the change in ownership. Nevertheless, the seller should not, contrary to a covenant not to compete or to the general duty to refrain from impairing the assets he sold, be permitted to deprive a purchaser of the opportunity to continue the business without interference from his own seller.

The customer preferences contained in the goodwill of a business are sufficiently fragile that the harm the new proprietor's business suffers from such interference by all traditional measures must be considered irreparable. The proprietor cannot calculate his losses with certainty, for after the fact, how can he feasibly establish which customers of the old proprietor deserted him because of improper solicitation or untimely competition? And how can he accurately measure in terms even of lost sales, the loss of the competitive position which was supposedly transferred to him with the goodwill of the business?

■ One final matter requires attention. Pursuant to Rule 38(d), plaintiff has moved to strike defendants' demand for a jury trial "on all issues in this matter triable by jury," which was served on plaintiff on November 23, 1981. First, since the action was removed from State court before defendants served their answer and counterclaims, the provisions of Rule 38, and not Rule 81, govern the timeliness of the demand. These require that the demand be made "not later than 10 days after the service of the last pleading directed to such issue." Rule 38(b). Defendants served their answer to the complaint on October 13, 1981. This pleading contained counterclaims alleging fraud, duress and breach of a sales representation agreement, to which plaintiff served its reply on November 9, 1981.

In these circumstances there is no question that the November 23 jury demand was overdue by a month on the issues

raised by the complaint and answer, and by four days on the issues raised in the counterclaims and reply, and that therefore defendants' jury trial right was waived. Rule 38(d).

■ While Rule 39(b) permits "the court in its discretion . . . to order a trial by a jury of any or all issues," it is settled in this Circuit that mere inadvertence is not a sufficient ground for the exercise of the court's discretionary power, see *Noonan v. Cunard Steamship Co.*, 375 F.2d 69, 70 (2d Cir. 1967); see also *Galella v. Onassis*, 487 F.2d 986, 996–97 (2d Cir. 1973), and that the "area open to the judge's discretion has shrunk to determining whether the moving party's showing beyond mere inadvertence is sufficient to justify relief." *Noonan v. Cunard Steamship Co., supra*, 375 F.2d at 70.

■ Here, defendants' proffered excuses do not, we think, go beyond inadvertence. Experienced New York counsel represented defendants locally until late October, and he acted at the direction of equally proficient Ohio counsel. That Ohio counsel was then admitted *pro hac vice* to supervise the lawsuit, and allegedly was "not up to speed" on all facets of the litigation, cannot, in these circumstances excuse the failure to make a timely demand.

Accordingly, the motion to transfer venue is denied, the motion to strike defendants' jury demand is granted, and counsel are directed to submit a proposed form of preliminary injunction within ten days.

SO ORDERED.

The Clerk of Court is directed to forward copies of this memorandum and order to counsel for the parties.