**JACK KAHN MUSIC CO., INC.,
Plaintiff-Appellee,**

v.

**BALDWIN PIANO & ORGAN COMPANY, Defendant-Appellant.**

**No. 959, Docket 79–7093.**

United States Court of Appeals,
Second Circuit.

Argued May 14, 1979.

Decided Aug. 1, 1979.

Howard Graff, New York City (Nemeroff, Jelline, Danzig, Graff, Mandel & Bloch, New York City, on the brief), for plaintiff-appellee.

Gary Lee Herfel, Cincinnati, Ohio (Frost & Jacobs, Cincinnati, Ohio, of counsel, and Whitman & Ransom, New York City, on the brief), for defendant-appellant.

Before MEDINA and TIMBERS, Circuit Judges, and SAND, District Judge.*

MEDINA, Circuit Judge:

Having failed in its opposition before District Judge Charles S. Haight, Jr., in the Southern District of New York, to the granting of a preliminary mandatory injunction in a private antitrust action, defendant Baldwin Piano & Organ Company appeals. The controversy between plaintiff, Jack Kahn Music Co., Inc., a seller at retail of pianos, organs and other musical instruments at various locations in Eastern Long Island, New York, and Baldwin arises out of the cancellation of a dealership contract by Baldwin. The preliminary mandatory injunction enjoins Baldwin from terminating Kahn's dealership until the final hearing of the antitrust suit.

In recent years there has been developing a substantial body of decisional law affecting a small but important segment of the law relating to the cancellation of retail dealerships by manufacturers. The procedural device employed in this group of cases is the service of a complaint in a private triple-damage antitrust action in which the retailer charges the manufacturer with various violations of the Sherman and Clayton antitrust laws and the simultaneous service of motion papers seeking a preliminary mandatory injunction preventing the manufacturer from cancelling the dealership agreement between the parties until the disposition of the antitrust suit. As the conclusion of the trial on the merits of the antitrust suit will in the normal course of events in all likelihood not take place for some years, if at all, the granting of such a preliminary mandatory injunction amounts as a practical matter, as here, to freezing plaintiff's revocable and hence temporary dealership into a dealership non-revocable for a substantial period. Thus here Baldwin thought it had entered into a two-year dealership, renewable from year to year and revocable on six months' notice. By the decision below it winds up with a non-revocable dealership of considerable duration, which is the very thing Baldwin thought the terms of the contract made impossible. The dealership contract was made on August 7, 1976. The notice of termination was given, one year, five months, and twenty-three days later, on January 30, 1978, to take effect on August 7, 1978. The complaint and the motion papers were served on July 20, 1978.

In this narrow field there are numerous opinions reporting decisions by many federal Courts of Appeals, including several in this, the Second Circuit. As is to be expected there is to be found in these opinions a certain amount of digressions and glosses, perhaps due to the circumstance that with overcrowded dockets and overworked judges there is always a feeling of urgency

* United States District Judge for the Southern District of New York, sitting by designation.

promptly to dispose of appeals involving injunctions.

As we are convinced that the decision below is wrong and that the result is not a just one and that we should reverse and vacate the injunction, we have given the appeal our most careful consideration and, in deference to the similar careful consideration below, by an able and conscientious judge, we shall try to explain in some detail our reasons for the view. we take of the case. We start with an analysis of the fundamental principles involved.

## I.

## PRELIMINARY SUMMARY OF CONTROLLING FUNDAMENTAL PRINCIPLES.

### A.

### *The Case is Before Us for "Full Review."*

■ As a general rule, an appellate court will reverse the grant or denial of a preliminary injunction only upon a clear showing that the District Judge abused his discretion, *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 931–32, 95 S.Ct. 2561, 45 L.Ed.2d 648 (1975), or erred in his application of the relevant law, *Triebwasser & Katz v. American Telephone & Telegraph Co.*, 535 F.2d 1356 (2d Cir. 1976). But as there was no evidentiary hearing in the District Court and the injunction was granted on a paper record containing only the affidavits, the pleadings and the briefs, we are, as stated by Chief Judge Kaufman, "in as good a position as the district judge to read and interpret the pleadings, affidavits and depositions." *Dopp v. Franklin National Bank*, 461 F.2d 873, 879 (2d Cir. 1972). As Judge Oakes noted in *Forts v. Ward*, 566 F.2d 849, 852 n.8 (2d Cir. 1977):

> When a district court renders its decision without an evidentiary hearing, an appellate court is not limited to reviewing the district court's exercise of discretion.

And this is particularly true where, as here, the affidavits are replete with flat contradictions, discrepancies, and unsupported conclusory statements. The trial judge saw

and listened to no witnesses and he had no demeanor impressions to affect his judgment. We think that there can be no reasonable doubt that in this Circuit we have appellate power of "full review" over the grant of this preliminary injunction. Judge Friendly has been hammering away at this point for years, and it is referred to in his most recent discussion of the powers of our Court in reviewing orders granting preliminary mandatory injunctions in *Buffalo Courier-Express, Inc. v. Buffalo Evening News, Inc.*, 601 F.2d 48 (2d Cir. 1979). Numerous decisions in this Circuit support this view. *Kampmeier v. Nyquist*, 533 F.2d 296, 299 (2d Cir. 1977); *Munters Corp. v. Burgess Industries, Inc.*, 535 F.2d 210, 211 n.4 (2d Cir. 1976); *San Filippo v. United Brotherhood of Carpenters and Joiners*, 525 F.2d 508, 511 (2d Cir. 1975); *Concord Fabrics, Inc. v. Marcus Brothers Textile Corp.*, 409 F.2d 1315, 1317 (2d Cir. 1969) (*per curiam*).

### B.

### *The Standard For Granting a Preliminary Injunction in This Circuit.*

■ This Circuit has long provided two alternative tests for the grant of a preliminary injunction. The tests both require a finding of irreparable injury and differ regarding the potential for success on the merits which the plaintiff is able to demonstrate at this early stage of the litigation. A recent statement of these tests is found in *Seaboard World Airlines, Inc. v. Tiger International, Inc.*, 600 F.2d 355, 359–360 (2d Cir. 1979), quoting *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir. 1979) (*per curiam*):

> Preliminary injunctive relief in this Circuit calls for a showing of "(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief."

*Accord, Caulfield v. Board of Education of the City of New York*, 583 F.2d 605, 610 (2d Cir. 1978); *Triebwasser & Katz v. American*

*Telephone & Telegraph Co., supra,* 535 F.2d at 1358–59; *Sonesta International Hotels Corp. v. Wellington Associates,* 483 F.2d 247 (2d Cir. 1973); Mulligan, *Foreword—Preliminary Injunctions in the Second Circuit,* 43 Brooklyn L.Rev. 831 (1977). In the present case Judge Haight granted the preliminary injunction on the basis of his findings of irreparable injury, a substantial question amounting to a fair ground for litigation, and a balance of hardships tipping decidedly in Kahn's favor.

This Court recognized in *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc., supra,* 596 F.2d at 72, that "[a]s to the kind of irreparable harm that the party must show, the language of some past cases has suggested to some a spectrum ranging from possible to probable, which is defined as 'not remote or speculative but . . . actual and imminent.' "[1] Judge Haight relied on the formulation of the test stated in *Caulfield v. Board of Education of the City of New York, supra,* 583 F.2d at 610, in which appears the phrase "possible irreparable injury." The great Voltaire once wrote in *Candide,* his most entertaining and perhaps most influential philosophical novel, that anything is possible in this best of all possible worlds.

 The basic statute we are construing here is Section 16 of the Clayton Act, 15 U.S.C. § 26, which requires "a showing that the danger of irreparable loss or damage is immediate," and the principles of "courts of equity, under the rules governing such proceedings" are made applicable. Ever since the establishment of the English Court of Chancery, hundreds of years ago, the basic rule has always been that there must be a showing that there is "no adequate remedy at law." We do not think that this fundamental rule has been changed so as to regard as sufficient proof of a lack of any remedy at law a mere speculation that there is a possibility that the party seeking the injunction may in some unproved way suffer loss or damage. In any event, Judge Mulligan's ruling in *Triebwasser & Katz v. American Telephone & Telegraph Co., supra,* disposes of this point, especially where, as here, the District Judge granted the preliminary injunction only on a showing of a fair ground for litigation. He wrote, 535 F.2d at 1359:

> If the element of irreparable harm is prerequisite for relief where the plaintiff must show probable success on the merits, then *a fortiori* where the plaintiff establishes something less than probable success on the merits, need for proof of the threat of irreparable damage is even more pronounced.

As we shall demonstrate in a later section of the opinion, we believe that Kahn has wholly failed to meet its burden of proving the requisite probability of irreparable injury upon termination of its Baldwin dealership. The injuries which Kahn alleges that it will incur on termination of its Baldwin dealership are in every sense ordinary and are compensable in light of the liberal rule for proving damages in antitrust cases. *SCM Corp. v. Xerox Corp.,* 507 F.2d 358 (2d Cir. 1974).

II.

BRIEF SUMMARY OF THE FACTUAL BACKGROUND AS DISCLOSED IN THE CONFLICTING AFFIDAVITS.

Kahn has engaged in the retail sale of pianos, organs and other musical instruments at discount prices since 1930. At the time this action was commenced Kahn stores were located in Freeport, Huntington, and Centereach, Long Island, and in Manhattan. Kahn sells numerous makes and models of pianos and organs at these stores other than those manufactured by Baldwin.[2]

---

1. *Compare, e. g., Caulfield v. Board of Education of the City of New York,* 583 F.2d 605, 610 (2d Cir. 1978), *with New York v. Nuclear Regulatory Commission,* 550 F.2d 745, 755 (2d Cir. 1977).

2. These include Hammond, Kimball, Yamaha, Kaiwa, Sohmer, Schimmel, Winter, Emerson, Weber, Aeolian, Melodigrand, Hardman, Mason & Hamlin, Kranich & Bach, Knabe, Pianola, Duo-Art, Bosendorfer, Mason & Kendall, and Caberet. Kahn does not carry such lines as Steinway, Gulbransen, Lowrey, and Wurlitzer.

Baldwin is a leading manufacturer of premier pianos and organs in the United States. Baldwin grand pianos are considered a standard of excellence. Baldwin studio pianos are also considered among the finest of their kind and are a favorite of institutional purchasers such as schools, churches, and the like. Baldwin markets its instruments through approximately nine hundred independent dealers and through some twenty-three company-owned stores. Baldwin has operated a company store in Manhattan for approximately forty years.

In August 1976 the former Baldwin dealer in Huntington, Freeport and Jamaica, Long Island, went out of business. Kahn then approached Baldwin about possibly obtaining a Baldwin dealership. On August 7, 1976, Baldwin and Kahn executed a written agreement whereby Kahn was appointed a dealer for the sale and service of Baldwin pianos and organs. The initial term of the Agreement was for only two years and for successive one-year terms unless either party terminated the Agreement on six months' written notice.

The Agreement contained the following "location clause":

2. *Sale of Instruments.* Baldwin shall sell to Dealer and Dealer shall purchase from Baldwin Instruments, the quantity and kind of said Instruments to be determined from time to time by mutual agreement of the parties. All Instruments shall be held for sale in the ordinary course of Dealer's retail business but only at the addresses set forth in Schedule 1, attached hereto, or such additional locations as shall have the prior written consent of Baldwin.

Though the parties did not attach a Schedule 1 to the Agreement, there is no dispute that at the time the Agreement was made Kahn was permitted to sell Baldwin instruments only at its Freeport and Huntington stores. Approximately one year later Baldwin extended its authorization to Kahn's store in Centereach. There is no dispute that on at least one occasion Baldwin enforced this location clause against Kahn.

Baldwin has never authorized Kahn to sell Baldwin instruments at the Kahn Manhattan store. Nor did the Agreement give Kahn exclusive rights to market Baldwin pianos and organs on Long Island. As the trial judge in footnote 2 of his opinion states that the White Plains situation "is not material to these motions," we shall not make any further reference to that peripheral phase of the case.

There is an irreconcilable conflict in the affidavits relating to conversations and various other matters that in our judgment have a very considerable bearing upon the ultimate decision we must make on the subject of whether or not the decision below brings about a miscarriage of justice, as we think it does. Despite a sprinkling of talismanic phrases and cliches, such as the reluctance of courts to issue mandatory injunctions, and the requirement that plaintiff make a "clear showing" to satisfy its undoubted burden of proof of irreparable damage and the other necessary requirements, it is not possible to discern any clear view by the trial judge concerning these conflicting and disputed issues. In our full review of the case, in order to reach a just result, we think we must give our reasoned views on the subject, just as Judge Friendly did in the case of the Buffalo newspapers to which we have already referred. And it is noteworthy that in that case there was an evidentiary hearing before Judge Brieant, whereas here there was no hearing whatever and the trial judge, as he said, was faced with an "incomplete record."

During the negotiations prior to the execution of the Agreement, Kahn and Baldwin officials discussed sales goals for the balance of 1976, 1977 and 1978 which Kahn was expected to meet. These goals were:

Balance of 1976: Pianos — 200 
Organs — 100 
300

Balance of 1977: Pianos — 500 
Organs — 300 
800

Balance of 1978: Pianos — 600 
Organs — 350 
950

These original goals were memorialized in a letter from Baldwin to Kahn dated July 20, 1976. It is significant, we think, that there was no reply by Kahn to this letter of transmittal and no prompt denial of the statement that these goals had been agreed upon. In any event, the very terms of the Agreement itself demonstrate, in our view of the record, that Kahn was only to start with a two-year dealership, with single-year extensions, unless on six months' written notice the dealership was revoked and cancelled. Bearing in mind the explosive increase in population in Eastern Long Island in the past decade and the very large potential market consisting of colleges, public and private schools, churches, theatres, hotels, and private homes, we think it highly improbable, contrary to Kahn's allegation, that any of the Baldwin officials referred to these original goals as "ridiculous."

The fact is that the purchases made by Kahn in 1976 and 1977, despite Kahn's unsupported assertions that the Baldwin line was "the cornerstone of its marketing effort" and that it had "expended large sums promoting and advertising Baldwin products," were:

| | | |
|---------------------|----------|-----|
| Balance of 1976: | Pianos — | 97 |
| | Organs — | 38 |
| | | 135 |
| Balance of 1977: | Pianos — | 291 |
| | Organs — | 116 |
| | | 407 |

On January 30, 1978, Baldwin notified Kahn in writing of its intention to terminate the Agreement effective August 7, 1978. In its letter of termination Baldwin assured Kahn that in the event Kahn was awarded contracts after the effective date on bids submitted before that date, Baldwin would supply the instruments necessary to meet these commitments.

Just prior to the time the cancellation notice became effective, and on July 20, 1978, Kahn caused to be simultaneously served its antitrust complaint against Baldwin and its motion papers on the application for the temporary preliminary injunction. It was agreed that the dealership should continue pending the determination of the motion.

## III.

## DISCUSSION

### A.

### *Irreparable Injury.*

We do not believe that Judge Haight placed any special reliance on the word "possible" in the test for the grant of a preliminary injunction enunciated in *Caulfield v. Board of Education of the City of New York, supra.* Rather, the gist of his position on the subject of irreparable damage is in the following sentence from his opinion, 1978–2 Trade Cases at 76,253:

Under these circumstances it is the finding of this Court that, although a substantial portion of Kahn's threatened injury would be ascertainable in money damages, there is another component of the injury which is also substantial and which cannot be calculated—the public's reaction and its influence on Kahn's goodwill.

This finding does not derive any support whatsoever from the record in this case. The Second Circuit cases as well as other cases relied upon by the District Court and Kahn are distinguishable since in each of them there was clear proof of an imminent threat of irreparable injury and not mere unsupported speculation as here.

One of the Second Circuit cases strongly relied upon is *Semmes Motors, Inc. v. Ford Motor Co.,* 429 F.2d 1197 (2d Cir. 1970). The most significant feature of this case is that the dealership had continued over twenty years during which Semmes had built up a very considerable goodwill in Scarsdale and the dealer's son had recently entered the business, doubtless with hopes of succeeding to it when his father became too old.

In *Jacobson & Co., Inc. v. Armstrong Cork Co.,* 548 F.2d 438 (2d Cir. 1977), we have the sort of thing referred to in the early part of this opinion. From some of the phraseology of Judge Hays' opinion one might almost suppose that the requirement

of irreparable damage had been eliminated and that all the law required was "a fair ground for litigation" of the antitrust issues and a showing that the balance of hardships was in plaintiff's favor. But a close study of the opinion shows that Judge Hays is applying the same old rule. And this must always be true because of the basic requirement in all cases in equity that there must be proof that there is no adequate remedy at law. And so it was with the seminal case of *Hamilton Watch Co. v. Benrus Watch Co.,* 206 F.2d 738 (2d Cir. 1953), in which Judge Jerome Frank wrote his famous opinion that originated the doctrine we are now applying, and Judge Hincks, then a District Judge in Connecticut, held the prolonged hearings resulting in his characteristically complete and detailed findings. And so we would expect to find ample proof of a threat of irreparable damage in *Jacobson* and that is precisely what we do find.

Jacobson had been a dealer of Armstrong products in New York City, Long Island, Westchester and Rockland Counties in New York State, Fairfield County in Connecticut, and in northern New Jersey for eight years. The Armstrong products were so varied and so widely used, especially in flooring and in acoustical walls and ceilings, and they were specified in the contracts of so many architects and builders, that the loss of the dealership was likely to put Jacobson at a decided competitive disadvantage as virtually all of Jacobson's competitors carried Armstrong products.

*Interphoto Corp. v. Minolta Corp.,* 417 F.2d 621 (2d Cir. 1969), is a case similar to *Jacobson.* Minolta products amounted to forty per cent of Interphoto's sales of Japanese cameras and lenses. Another phase of both *Jacobson* and *Interphoto* was that each was a full line dealer with a full range of products in its particular field. The loss of either of these dealerships would cause a loss of customers to other dealers who could provide a full range of services and products. *See also Supermarket Services, Inc. v. Hartz Mountain Corp.,* 382 F.Supp. 1248 (S.D.N.Y.1974).

Curiously enough, the principal reliance by Judge Haight was on a Fourth Circuit case that first appeared in Kahn's reply brief in the District Court. The case is *Blackwelder Furniture Co. of Statesville, Inc. v. Selig Manufacturing Co., Inc.,* 550 F.2d 189 (4th Cir. 1977), and the quotation relied on refers to potential irreparable injury to the dealer's goodwill due to "grumbling customers" who complained because of Blackwelder's inability to honor Selig orders. It was said this might give the dealer "a reputation for unreliability." There was no such claim in the Kahn affidavits and there is no proof whatever in this case of any grumbling customers. The facts of the two cases differ so radically that we think reliance on this case is completely misplaced.

Blackwelder was a discount distributor of many types of furniture and had been a successful Selig dealer for over ten years. Blackwelder made thirty-five per cent of its purchases of "contemporary upholstered furniture" from Selig, which manufactured one of the top three lines of this type of furniture. While Blackwelder was based outside the Washington, D.C. area, part of its sales were to mail-order customers in that area. Often these customers would go to the showrooms of local retailers, select the models they desired, and then place their orders with Blackwelder at discount prices. This practice brought on the ill will of the Washington dealers, who allegedly pressured Selig to remove Blackwelder as a factor in the Washington market. Cancellation of its Selig dealership left Blackwelder unable to fill outstanding and accumulating orders for Selig furniture in excess of $15,000. On this record the Fourth Circuit determined that "[w]ord-of-mouth grumbling of customers can convert Blackwelder's inability to honor Selig orders into a reputation for general unreliability as a merchant. Losing Selig can set back Blackwelder's efforts to become known as a 'full line' furniture discounter." 550 F.2d at 197. The Court concluded that this injury to goodwill was incalculable. It is highly significant that in its letter terminating Kahn's dealership, Baldwin assured Kahn that in the event Kahn was awarded con-

tracts on bids submitted before the effective date of termination, Baldwin would supply the instruments necessary to meet these commitments.

■ Thus the record in this appeal provides absolutely no evidence suggesting that the loss of the Baldwin line will result either in various customers abandoning Kahn for other dealers who can provide a full range of services or with Kahn unable to fill outstanding orders for Baldwin instruments. Cutting through the morass of unsupported allegations of irreparable damage, the essence of Kahn's claim is for the loss of the alleged profitable business of selling Baldwin pianos, organs and other musical instruments. There is no doubt that any such loss is provable. So also, even if we take at face value Kahn's statement that it had "expended large sums promoting and advertising Baldwin's products," all these are clearly also provable as part of Kahn's damages, if the cancellation was wrongful.

One of the reasons given for highly praising the private triple-damage antitrust case for the efficient way it is used to enforce the antitrust laws is that there is applicable to this type of case a very liberal rule for the proving of damages. It is critical to this case to keep in mind the fact that the tentative and exploratory dealership lasted only one and one-half years from the date of signing the agreement to the date of sending the written cancellation notice. This short period of time and the performance record of Kahn above referred to make it doubtful that there was sufficient time to build up much reputation and goodwill. We do not think the record supports Kahn's expansive claim that Kahn "made Baldwin instruments a cornerstone of its marketing effort."

### B.

*The Antitrust Phase of the Case: A Fair Ground For Litigation.*

■ As noted above, Judge Haight ruled that while Kahn had failed to demonstrate a probability of success on the merits, it had made out a "fair ground for litigation," satisfying the alternative test for the grant of a preliminary injunction. The trial judge's analysis of this feature of the case is clear, precise and correct. As we agree with Judge Haight's treatment of this phase of the case, we shall do no more than briefly restate his position. Our disagreement with the decision below relates to the requirements of irreparable harm and a balance of hardships decidedly in Kahn's favor.

Considering the short period of time, one and one-half years, that the dealership was in operation before Baldwin served the notice of cancellation, it seems surprising that Kahn had discovered so many and such comprehensive violations by Baldwin of the Sherman and Clayton Acts. The complaint reads as though everything in the books was included. But the support in the affidavits is sketchy and on all but a single phase of the claim Baldwin has submitted affidavits denying what was stated in the Kahn affidavits. For this and for other reasons it was clear that Kahn had not shown any "probable success on the merits."

On the other hand, the dealership agreement on its face showed that Kahn's right to sell the Baldwin pianos and organs was limited to certain physical locations in certain designated places, and Baldwin asserted its right to insist upon Kahn's compliance. This is what is called a "vertical" restraint. And the reason this phase of the case presented "a fair ground for litigation" is that the Supreme Court had fairly recently overruled an earlier case on this very subject and had held that such vertical restraints were not *per se* violations but rather that they were governed by the rule of reason.[3] This necessarily meant a long drawn out trial, as a decision with respect to the reasonable nature of the location clause in Kahn's dealership contract could only be decided after full and complete

---

3. *Continental T. V., Inc. v. GTE Sylvania Inc.,* 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977).

proof of the nature and extent of Baldwin's operations, and its system of dealerships. This is what made this phase of the antitrust claim "a fair ground for litigation."

## C.

### The Balance of Hardships.

 Having already held that Kahn has failed to prove a probability of irreparable damage resulting from termination of its Baldwin dealership, there is little to add on the subject of the balance of hardships.

Even if Kahn's profits of operation of its discount business diminish because it is less competitive after the loss of the Baldwin line, it should have foreseen this result if it failed to live up to its overly optimistic representations during the preliminary negotiations leading to the original sales goals memorialized in Baldwin's letter to Kahn dated July 20, 1976.

And it seems significant that, although the trial judge denied all Kahn's applications for preliminary injunctive relief relative to its multiple antitrust claims, the order disposing of the motion contains not a single word of protective relief for the benefit of Baldwin during the pretrial and trial of the antitrust case. We think it not unlikely that Kahn might and probably would proceed to act in this interval as though the location clause in the dealership agreement had already been found by some court to be illegal.

Despite the fact that the notice of termination was given in strict conformity with the terms of the Agreement, and six months before the expiration of the short two-year initial period of the dealership, if the preliminary mandatory injunction is sustained Baldwin will be frozen into an intimate and continuous relationship with a dealer it no longer wishes to be associated with. It seems inevitable that a firm of Kahn's aggressive character will cause continual friction over the delivery and servicing of the pianos and organs, and other matters. One of the reasons the contract was of so short duration and subject to such short cancellation notice may be assumed to

be that one of the undoubted rights a manufacturer still has is to use its own judgment with respect to those whom it wishes to appoint as its dealers. To bear this burden for an indefinite number of years is a great hardship.

Under the above circumstances we do not see how we can do otherwise than to hold and decide, as we do, that Kahn has not sustained its burden of proving that the balance of hardships tips decidedly in Kahn's favor.

### CONCLUSION

The order is reversed and the injunction is vacated, with costs.