**DISABLED IN ACTION OF METROPOLITAN NEW YORK, INC. and R.A.M., on behalf of their members, and Selim Heffes and Bertha Hook, individually and on behalf of all others similarly situated, Plaintiffs,**

v.

**Stanley BREZENOFF, in his capacity as Commissioner of Social Services of the City of New York, Barbara Blum, in her capacity as Commissioner of the New York State Department of Social Services, and Robert Berglund, in his capacity as Secretary of the United States Department of Agriculture, Defendants.**

No. 80 Civ. 6508.

United States District Court,
S. D. New York.

Nov. 21, 1980.

245

Marla G. Simpson, Daniel J. Wise, Norman Spiegel, Community Action for Legal Services, Inc., New York City, of counsel, for plaintiffs.

John P. Cunningham, Kathleen A. Masters, The Legal Aid Society Administrative Law Unit, New York City, of counsel, for Disabled in Action of Metropolitan New York, Inc.

Marshal Green, Legal Aid Society Brooklyn Office for the Aging, Brooklyn, N. Y., for plaintiff Selim Heffes.

Arnold Rothbaum, Cindy Mann, Brooklyn Legal Services, Corp. A, Brooklyn, N. Y., for plaintiffs Hook and RAM.

John J. Martin, Jr., U. S. Atty., S. D. New York, New York City by Leona Sharpe, Asst. U. S. Atty., New York City, for defendant Robert Bergland.

Robert Abrams, Atty. Gen. by Jeffrey I. Slonim, New York City, for defendant Barbara Blum.

Allen G. Schwartz, Corp. Counsel of the City of New York by Maralyn Fairberg, Asst. Corp. Counsel, New York City, for defendant Stanley Brezenoff.

OWEN, District Judge.

Plaintiffs, two public interest organizations suing on behalf of their members and two individual food stamp recipients suing individually and on behalf of all New York City residents who are receiving food stamps, seek a preliminary injunction enjoining defendants Stanley Brezenoff, Commissioner of the New York City Human Resources Administration, Barbara Blum, Commissioner of the New York State Department of Social Services, and Robert Berglund, Secretary of the United States Department of Agriculture (the "Secretary"), from putting into effect certain emergency procedural regulations promulgated by the Secretary, applicable only to New York City, and designed to combat multi-million dollar fraud losses occurring in the food stamp program in New York City.[1] The plaintiffs allege that the Secretary's new regulations were issued in violation of (1) the federal Food Stamp Act, 7 U.S.C. § 2026(b), (2) the federal Administrative Procedure Act (the "APA"), 5 U.S.C. § 553, (3) the due process clauses of the fifth and fourteenth amendments, and (4) the New York State Administrative Procedure Act, N.Y.Ad.Pro.Law § 100 et seq. (McKinney). After extensive oral argument on such short notice that defendants had no time to prepare and submit papers in opposition, I conclude that plaintiffs have failed to meet their burden of showing

(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2)

1. According to the Secretary's announcement of the new project, "New York City issues a far larger number of replacement [food stamp vouchers] than any other jurisdiction in the country." 45 Fed.Reg. 69196.

sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting preliminary relief.

*Jack Kahn Music Co., Inc. v. Baldwin Piano & Organ Co.*, 604 F.2d 755, 758 (2d Cir. 1979).

The food stamp program, in broad outline, operates as follows. Upon the demonstration of an entitlement, one is given a card with one's identification number. Thereafter, each month, there is mailed[2] to each recipient a document called an "ATP."[3] ATPs are mailed on a staggered system throughout the month, but it is intended that each recipient will receive his particular ATP on approximately the same day of each month. Under the procedure in effect until December 1, 1980, with exceptions not relevant here, each recipient has the balance of the month to present the ATP at a bank or other authorized agency in exchange for the food stamps themselves, which can then be presented to grocery stores for food. An ATP claimed to be lost or stolen can be replaced, at an appropriate office, by the mere giving of an affidavit reciting such fact, leaving the agency in a poor posture to pursue or prosecute false claims.[4]

The new procedure[5] provides two changes, one flowing from the effect of the other. A limitation is now established of eight days within which to redeem any given ATP for stamps; the said eight day period—printed on the face of the ATP—commences with the date when the agency expects the ATP to arrive at the recipient's residence, given the date of mailing and normal mail service. After the eight days the ATP will not be honored. If an ATP has merely been allowed to lapse by the recipient not redeeming it within the eight days, it may be exchanged for a new one. Thus, the recipient does not lose his entitlement. However, if it is claimed to have been lost or stolen, the recipient must wait four days beyond the anticipated arrival date before requesting a replacement at a local office. The agency may further wait five business days before considering issuance of a duplicate ATP. This will permit a new computer retrieval system to determine if the ATP was in fact negotiated or not. If the original ATP has not been redeemed, a replacement will be issued. On the other hand, if it has been negotiated, the claimant must go to a central office in Manhattan (fare provided by HRA) where, by that time, there will be a photocopy of the negotiated ATP. There the identification number put on the ATP by the party negotiating it, as well as the signature, will be compared to the recipient's number and signature. If neither the number nor the signature match, the ATP is replaced. However, if either the signature or the identification number are that of the entitled recipient, replacement will be denied with the right to appropriate fair hearing thereafter.[6] It is this simple procedural device, *i. e.*, shortening the life of the original ATP and establishing a clearance time after its negotiable life to enable the agen-

---

2. In New York City, the mailing is done by the New York City Human Resources Administration (HRA).

3. Authorization to Participate in the Food Stamp Program.

4. Under the current system the agency's only recourse is to investigate double payouts *after* the fact and then attempt to recoup the amount *fraudulently obtained. The new procedure will* enable the agency to determine, before issuing duplicates, whether those ATPs reported lost have, in fact, been negotiated.

5. The new procedures for reporting and replacing lost ATPs were instituted on October 17, 1980, the very day the project was announced

in the Federal Register. The so-called "Rapid Access Reconciliation," which is designed to detect fraud in the use of ATPs prior to the issuance of duplicates, is scheduled to go into effect on December 1, 1980. The new ATPs, with varying expiration dates reflecting their shortened periods of validity, went to press on November 18, 1980, the day after argument, with the court's approval.

6. The food stamp recipient is entitled to receive review that very day by Fraud Unit supervisory personnel; assuming an unfavorable decision at this level, the recipient may thereafter request a fair hearing.

cy to check any earlier surrendered ATP with the signature and number of the recipient, which will, in the Secretary's opinion, substantially reduce the 1.2 million dollars per month presently paid out for ATPs that have in fact been cashed and are thereafter falsely reported as lost or stolen.

The plaintiffs' principal complaint is over the eight day period of life for the forthcoming ATPs. They argue, and probably not without some truth, that on occasion mail is late, that the health of a recipient on a given day or week may preclude his going out to redeem the ATP, or that the homemaker provided in some instances by the New York City Department of Social Services to disabled recipients may not come in at the proper time to redeem the recipient's ATP.[7] I am sure that in some instances, the foregoing may on occasion occur causing a particular ATP to lapse. How-

ever, one did not get any feeling from the oral argument herein that plaintiffs had any appreciation of the fact that an ATP that had merely lapsed could be immediately renewed by exchanging it at a central office in New York or by surrendering it at the customary local office in any borough, in which case, a replacement would come four days later in the mail.[8]

I note, and it also was clear from the oral argument, that the plaintiffs do not object to the fact that a recipient must wait four days before reporting an ATP lost or stolen.[9]

To attack the eight day life of the ATP—albeit renewable, plaintiffs contend that this change is a "substantial" matter which has been promulgated without compliance with the notice and public comment requirements of the APA.[10]

---

7. Redemption of an ATP by an authorized agent—who can be changed monthly—is permitted.

8. There is before me an affidavit of a psychiatric social worker who urges that this shortened time will cause anxiety on the part of certain recipients; that, too, may be true in certain cases. On the other hand, I am informed that the experience of the Secretary under the present procedure is that 90% of the recipients of ATPs in fact cash them within eight days; that 5% for some inexplicable reason never cash them at all, and roughly 2½% are reported lost or stolen. Thus, no matter what percentage of the remainder includes those who do not redeem an ATP within eight days, it is statistically small and were the eight day limit imposed, the new limit might well be honored by most of those who now feel less compulsion or need to redeem promptly. Only time and experience will tell.

9. Plaintiffs also do not object to the fact that the Fraud Prevention Unit will be located at a central office in Manhattan, although at oral argument they complained that it may be financially burdensome in some cases to make even such a trip. However, the Secretary's representation at oral argument, which also appears in the Secretary's announcement of the program, 45 Fed.Reg. 69196, that the HRA would pay the recipient's round-trip carfare to the central office appeared to mollify plaintiffs' objections to this provision. Plaintiffs apparently object to the unit being called the Fraud Prevention Unit, contending this is offensive to those who, though innocent, feel accused by merely being required to report to such a unit

to obtain a replacement. I do not deem it appropriate for the court to get involved in the title that is given to such a governmental unit under these circumstances.

10. Section 553 of the APA provides as follows:
(b) General notice of proposed rule making shall be published in the Federal Register .... The notice shall include—
(1) a statement of the time, place, and nature of public rule making proceedings;
(2) reference to the legal authority under which the rule is proposed; and
(3) either the terms or substance of the proposed rule or a description of the subjects and issues involved.

\* \* \* \* \* \*

(c) After notice required by this section, the agency shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation. After consideration of the relevant matter presented, the agency shall incorporate in the rules adopted a concise general statement of their basis and purpose. When rules are required by statute to be made on the record after opportunity for an agency hearing, sections 556 and 557 of this title apply instead of this subsection.
(d) The required publication or service of a substantive rule shall be made not less than 30 days before its effective date, except—
(1) a substantive rule which grants or recognizes an exemption or relieves a restriction;
(2) interpretative rules and statements of policy; or

Defendants, on the other hand, argue that the regulations in question are exempted from the APA's public comment requirements under the "emergency" exception to the APA. *See* Senate Report No. 752, 79th Cong. 1st Sess. at 200 (1945). Section 553(b)(3)(B) of Title 5 provides that notice and a hearing are not required

> when the agency for good cause finds (and incorporates the finding and a brief statement of reasons therefor in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest.

In publishing and explaining the new program in the Federal Register, 45 Fed.Reg. 69196 (October 17, 1980) (to be codified at 7 C.F.R. § 282.15), the Secretary found, pursuant to Section 4 of the APA, 5 U.S.C. § 553,

> that notice and other public procedures with respect to this emergency final action are impracticable and contrary to the public interest; and good cause is found for making this emergency final action effective less than 30 days after publication of this document in the Federal Register.

In his announcement in the Federal Register and again at oral argument, the Secretary contended "[t]he gravity of New York City's replacement ATP problem necessitates the expeditious implementation of this new system." *Id.* Further, in the Secretary's view, albeit in another context, the changes in question are not substantial.[11] I agree with both the need for emergency action as well as the assessment that the changes, certainly in so far as they affect *innocent* recipients, are not "significant."

■ Further, it is obvious that the new procedures seem reasonably likely to reduce both the number of replacement ATPs issued each month and, more important, the amount of federal money that is lost through fraud. In the face of the severe problem the Secretary faces in New York

City and the reasonable Congressionally authorized program which has been designed to deal with that problem, I conclude that plaintiffs have failed to demonstrate either (1) a likelihood of success on the merits or (2) a balance of hardships tipping decidedly in their favor. Thus, even if plaintiffs' claim that the program violates the APA were to present a serious question going to the merits sufficient to make it a fair ground for litigation, plaintiffs still have failed to sustain the heavy burden required to warrant a preliminary injunction on this ground.

■ Defendants also contend that in the Food Stamp Act Congress has expressly granted the Secretary the authority to conduct experimental or pilot projects "designed to test program changes that might increase the efficiency of the food stamp program . . . ." 7 U.S.C. § 2026(b)(1). This experimental program is scheduled to last two years, and the Secretary has invited *post hoc* public comment on the new procedures and provided for the future possible amendment thereof. *See* 45 Fed.Reg. 69197 (1980). Thus, preliminarily, and on this record, I find that the program at issue herein is within the Secretary's statutory authority, further making a preliminary injunction unwarranted.

Discussion of the remaining allegations on which plaintiffs attempt to ground their request for preliminary relief is unnecessary. Regardless of the probability of success on the merits or the seriousness of the questions presented in plaintiffs' other causes of action, the plaintiffs have failed to demonstrate that the threat of irreparable harm is sufficiently grave to justify the issuance of a preliminary injunction. *See Jack Kahn Music Co., Inc. v. Baldwin Piano & Organ Company, supra*, at 761–2 and cases cited.

---

(3) as otherwise provided by the agency for good cause found and published with the rule.

11. In his announcement of the emergency final rule-making in the Federal Register, the Secretary noted, "[t]he final action has been reviewed . . . and has been classified as not significant." 45th Fed.Reg. 69196.

Whether or not plaintiffs ultimately prevail on the merits, from an examination of the New York City pilot program which they seek to enjoin, I do not believe that plaintiffs will be irreparably injured by the commencement of the proposed experiment. At most, the new regulations will cause those plaintiffs who allow their ATPs to expire to make an extra trip to their local Income Maintenance office to get new ones. Although one cannot tell from this vantage point to what extent such inconvenience will occur, it does not, in my opinion, constitute irreparable harm. Similarly, while those whose ATPs are lost or stolen and subsequently redeemed will have to make an additional trip to the central Fraud Prevention Unit, this inconvenience is also minor, particularly given the fact that transportation expenses are to be paid by the City.

For the foregoing reasons, the preliminary injunction is denied.

Class action certification pursuant to Fed. R.Civ.P. 23(b)(2) is granted, the class to be defined as all New York City residents who are food stamp recipients on or after December 1, 1980.

So ordered.