**FASHION FURNITURE COMPANY, INC.; Carafiol Furniture Company, Plaintiffs,**

v.

**ETHAN ALLEN, INC., Defendant.**

**No. 83–0007C(4).**

United States District Court, E.D. Missouri, E.D.

Feb. 9, 1983.

Theodore D. Ponfil, Blumenfeld, Sandweiss, Marx, Tureen, Ponfil & Kaskowitz, St. Louis, Mo., for plaintiffs.

Keith E. Mattern, James K. Pendleton, St. Louis, Mo., for defendant.

## MEMORANDUM

HUNGATE, District Judge.

This matter is before the Court on plaintiffs' motion for a preliminary injunction under Rule 65(a) of the Federal Rules of Civil Procedure.

Plaintiffs are retail distributors of defendant's furniture products. Plaintiffs' complaint alleges that defendant has wrongfully terminated plaintiffs' supply of defendant's products by a termination notice effective February 15, 1983. By the present motion, plaintiffs seek to require defendant to continue to supply them with defendant's product until its claim for wrongful termination is finally adjudicated.

An evidentiary hearing on plaintiffs' motion was held on February 2, 1983. All parties were represented by counsel and presented evidence. After consideration of the evidence and the memoranda of the parties, the Court hereby makes and enters the following findings of fact and conclusions of law.

### Findings of Fact

1. Plaintiffs, Fashion Furniture Company, Inc., and Carafiol Furniture Company, are now and at all times relevant hereto were Missouri corporations having their principal place of business in St. Louis County, Missouri.

2. Defendant, Ethan Allen, Inc., is now and at all times relevant hereto was a Delaware corporation having its principal place of business in the State of Connecticut.

3. Defendant, Ethan Allen, Inc., is now and at all times relevant hereto was doing business in the State of Missouri.

4. Plaintiffs are now, and at all times relevant hereto were, engaged in the business of the retail sale to the public of high-quality furniture and accessories in the metropolitan St. Louis area.

5. Defendant is now, and at all times relevant hereto was, engaged in the business of marketing high-quality furniture and accessories to retailers such as plaintiffs for resale to the public.

6. Plaintiffs have been selling defendant's products since 1957. At present, approximately 28–30% of plaintiffs' sales consist of defendant's merchandise, equalling approximately $2,000,000 in retail sales. Since 1970, plaintiffs have been the only retailer of defendant's goods in St. Louis and St. Louis County, although no agreement of exclusivity exists.

7. There exists no formal written contract regarding the terms of the parties' relationship. Plaintiffs contend that defendant is limited to and bound by the description of defendant's relationship with its dealers contained in documents known as EA–1 and EA–2 (plaintiffs' exhibits 2 and 3), issued by defendant in 1969 and thereafter. These documents were distributed by defendant to Ethan Allen furniture dealers throughout the country.

The provisions regarding termination are contained in EA–1. This document provides, in pertinent part, as follows:

### Our relations with our dealers

While we try to maintain a close working relationship with our dealers, they and we must recognize that we are vendors and our dealers are vendees. Our dealers may buy from whatever resources they choose. We may sell to whomever we choose. What concerns us primarily is whether our dealers are meeting the Program's expectations.

\* \* \* \* \* \*

In short, our dealers may sell the Ethan Allen line to whomever, from wherever and at such prices as they choose.

\* \* \* \* \* \*

Termination of dealings between our company and a dealer may, of course, be effected by a dealer at any time, with or without cause or notice. On the other

hand, we will usually terminate such dealings only if in our judgment, the dealer has not achieved the expectations of the Program, in whole or in part.

"The Program" referred to is the Ethan Allen marketing program, described by EA–1 as follows:

### The Ethan Allen Marketing Program

Our faith in Ethan Allen is profound. Its standing with the public always concerns us as something fine and great—to be cherished and preserved to the utmost.

The Ethan Allen Marketing Program is a phrase—for short call it the Program—to indicate simply what we, our dealers, and the consumers may expect. If consumers receive the benefits which the Program provides, then we and our dealers should continue to prosper through increasing patronage and goodwill.

WHAT CAN BE EXPECTED FROM US: to offer good value at a moderate price; good design that is correlated, integrated, coordinated and gives continuity, quality materials and workmanship; and aids to our dealers such as store location, architectural plans, interior display planning, merchandising, advertising and publicity programs, consumer guides, training and educational siminars [sic] and transportation and regional warehousing programs, to enable our dealers to serve consumers better.

WHAT CONSUMERS AND WE CAN EXPECT FROM OUR DEALERS: to maintain an adequate display of the Ethan Allen line in a setting that will enable consumers to choose wisely and well; furnish skillful and practical decorator service and assistance to consumers; maintain adequate inventory to enable reasonable deliveries to be made to consumers; continue to service consumers after rules [sic] are made; deal fairly with consumers in all contacts; advertise the Ethan Allen line adequately enough for the marketing area; attain and maintain a sales level which, in our judgment, represents the sales potential for the Ethan Allen line in the marketing area; have and maintain a credit standing and payment record acceptable to us; and last, but not least, to place primary emphasis on consumer needs rather than product promotion.

This is the Ethan Allen Marketing Program.

Defendant, however, issued other written statements regarding its expectations from dealers, see, e.g., defendant's exhibit EEEEEEEE, and stated that EA–1 and 2 should be read in conjunction with other documents. Plaintiffs' exhibit 4.

8. In the early 1970s, the relationship between plaintiffs and defendant began to deteriorate. Defendant's chairman, Nathan Ancell, testified that plaintiffs "began to alter the concept rather substantially, in our opinion, and they—I felt that they were trying to develop the Carafiol concept, as opposed to the Ethan Allen concept." Tr. 154.

9. Defendant supported its assertion that plaintiffs have abandoned the Ethan Allen marketing program with evidence that:

(a) Plaintiffs abandoned the American Colonial appearance of their store exteriors, associated with Ethan Allen, and built an Ethan Allen annex to a competitor's (Drexel Heritage) prototype store. About one-half of the annex is devoted to display of Ethan Allen products. Plaintiffs then opened a general furniture store with no external identification with Ethan Allen.

(b) Plaintiffs abandoned their Ethan Allen identification on their letterhead and in their Yellow Pages advertisement.

(c) Plaintiffs did not participate in the use of the Ethan Allen mailer, and substantially decreased their use of the Ethan Allen "catalog" or "treasury."

(d) Since 1977, plaintiffs' purchases from defendant have diminished while plaintiffs' purchases from other manufacturers have increased.

(e) Plaintiffs failed to furnish defendant with monthly financial statements.

10. Plaintiffs claim that their termination is the result of defendant's plan to terminate all multiline furniture dealers. Plaintiffs' evidence showed that the number of multiline stores carrying defendant's products has declined by 100 since 1974. Plaintiffs' expert also testified that plaintiffs' performance was substantially equivalent to defendant's prototype stores, and that customers preferred multiline stores over single line stores.

11. The parties understood that in the event of termination, defendant would provide plaintiffs a fair transition period. This period is described by EA–1 as follows:

In the event of termination by us, it is our policy to phase out the Ethan Allen line so that the dealer will have an adequate period to balance and sell his inventory of Ethan Allen while replacing that line with another. When justified by a satisfactory credit standing, we will arrange payment terms so as to lessen the burden on the dealer in the settlement of his account with us, and this will prevail whether the termination is by us or by the dealer. Our objective is to give the dealer an opportunity to realign his business over a reasonable period of time so that the adjustment can be made with minimal inconvenience.

12. Plaintiffs presented expert testimony that it would take plaintiffs three years to regain their lost sales volume with substitute products. Defendant's evidence indicated that a dealer could replace the lost inventory at one of the industry's furniture shows, held in April and October of each year.

13. Plaintiffs were informed of defendant's intention to terminate plaintiffs at least as early as July of 1982 (plaintiffs' exhibit 9). In October, 1982, at an industry show in North Carolina, plaintiffs were informed that they would be terminated and that they should arrange to find a replacement line at the show. Plaintiffs did not do so.

14. On December 10, 1982, defendant confirmed its decision in writing to terminate plaintiffs effective February 15, 1983. The letter also informed plaintiffs:

Should you have any packed current inventory, we would be glad to arrange for a return of such inventory to us. We also realize that you will have some of your customers coming back to you to fill in an item or two to go with what purchases they have made from you before. We are perfectly willing to handle these legitimate fill-in orders for a period of one year after February 15, 1983. This has been our procedure in previous terminations and it has been felt to be a fair and equitable approach.

15. Plaintiffs' expert testified that plaintiffs' business could not withstand an abrupt termination in supply of defendant's goods. Defendant's chairman testified that by his rough calculation, defendant would lose approximately $7,000 every week that termination was delayed.

## Conclusions of Law

1. The Court has jurisdiction over the parties.

2. Subject matter jurisdiction is conferred by 28 U.S.C. § 1332 and Rule 65, Fed.R.Civ.P.

3. Four factors are to be considered in determining whether a preliminary injunction should issue: the threat of irreparable harm to the plaintiffs; the state of balance between this harm and the injury that granting the injunction will inflict on defendant; the probability that plaintiffs will succeed on the merits; and the public interest. *Dataphase Systems, Inc. v. CL Systems, Inc.*, 640 F.2d 109, 114 (8th Cir.1981).

4. Plaintiffs assert that if the termination is not enjoined, they will suffer the loss of their business and harm to their goodwill, and that such injury is irreparable by money damages.

The Court finds plaintiffs' argument unpersuasive. The sale of defendant's goods comprises only 28–30% of plaintiffs' business. Plaintiffs' own expert was able to forecast, on the basis of past records, the expected profits to plaintiffs through the sale of defendant's goods, as well as the

point in time by which any loss could be recouped. His generalized assertion that termination would be devastating and irreparable was unconvincing. Further, defendant has assured plaintiffs that it will continue to provide replacement items, protecting at least partially the loss of goodwill. If plaintiffs are given a reasonable time to secure a substitute inventory, the harm resulting to plaintiffs from the termination could be substantially compensated in money damages should the termination eventually be found wrongful. The evidence that defendant's sales volume is in excess of $250,000,000.00 per year was uncontradicted. Its ability to respond to a damage award is obvious.

The Court is not persuaded otherwise by the statement in *Semmes Motors, Inc. v. Ford Motor Co.*, 429 F.2d 1197 (2d Cir.1970) to the effect that the termination of one's business cannot be fully compensated by a damage award. In the opinion of the Court, the termination herein would not result in the ruination of plaintiffs' business.

5. Although the evidence of economic harm which an injunction would cause defendant is somewhat speculative, it is clear that defendant is unsatisfied with plaintiffs' marketing of defendant's products, and that defendant will continue the relationship only if forced to do so by this Court. The Court could not expect such a forced marriage to be free of acrimony, and doubts that good business can be done under the force of an injunction. *Jack Kahn Music Co., Inc. v. Baldwin Piano and Organ Co.*, 604 F.2d 755, 764 (2d Cir.1979). The Court should not attempt to issue orders to which it cannot reasonably compel compliance. To force defendant to do business with plaintiffs could foreseeably put the Court in the furniture business permanently.

6. The Court rejects plaintiffs' argument at the outset that the termination herein is governed by Connecticut law. Connecticut has no interest in protecting Missouri franchises. Any contact with Connecticut is minimal at best.

Without the benefit of a full trial after complete discovery, the Court finds it unlikely that plaintiffs will succeed on the merits of their claim that the termination is wrongful. At this preliminary stage, the Court can only conclude that the terms of the parties' relationship were never explicitly defined. It is surprising to learn that two parties would do business for over a quarter of a century, with no contract of the sort lawyers prepare daily for parties whose business relationships are far less extensive. Too often when parties fail to make contracts themselves, the courts are called upon to do it for them.

Even assuming that defendant's termination rights are governed by the language of EA–1, the statement that dealers will be terminated only for failure to adhere to the marketing program is qualified by the proviso that the determination of the dealer's compliance rests in defendant's own judgment. Assuming further that defendant is required to exercise that judgment reasonably, the evidence showed a reasonable basis for defendant's decision. Defendant's marketing plan evolved throughout the years, but always required that defendant's products be marketed in a manner substantially, if not exclusively, identified with the Ethan Allen service concept. Defendant's conclusion that plaintiffs were slowly but surely disassociating themselves from their identification with Ethan Allen was not unreasonable.

The Court does, however, find some likelihood that plaintiffs could succeed on the merits of their claim that defendant is required to provide plaintiffs a reasonable termination period extending beyond February 15, 1983. Although plaintiffs were informed of defendant's intent to terminate, final termination came with defendant's letter of December 10, 1982. It is reasonable to expect that plaintiffs could replace their lost inventory shortly after the April industry show. The Court rejects plaintiffs' argument that they are entitled to a period in which to replace lost sales. No such language appears in EA–1, and, as Mr. Ancell testified, a dealer's sales volume

is determined by his own actions. The Court does not concur in the opinion of plaintiffs' expert that a fair transition period would be three years. The expert seemed to assume that the plaintiffs were as newcomers to the furniture business, without contacts. Other evidence, however, indicated that these parties met many times at industry shows and that plaintiffs have viable relationships with many other furniture manufacturers. Under these circumstances, it might fairly be inferred that plaintiffs could learn the furniture business in less than three years, or they would never learn it.

For the reasons stated, the Court will enjoin defendant from terminating plaintiffs until May 2, 1983. On the basis of Mr. Ancell's testimony, the Court will require plaintiffs to post a bond in the amount of $50,000. The bond shall continue pending determination on the merits of the claims herein, to provide security for any damages suffered by defendant should defendant eventually be found to have been wrongfully enjoined. Rule 65(c), Fed.R.Civ.P.

7. The public interest in this private business dispute is minimal.